Filed 7/28/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S075616 |
| v. | ) | |
| | ) | |
| JOHN ANTHONY GONZALES and | ) | |
| MICHAEL SOLIZ, | ) | |
| | ) | Los Angeles County |
| Defendants and Appellants. | ) | Super. Ct. No. KA033736 |
| _____ | ) | |

A Los Angeles County jury found defendants John Anthony Gonzales and Michael Soliz guilty of the first degree murder of Lester Eaton (count 1), Elijah Skyles (count 4) and Gary Price (count 5). (Pen. Code, §§ 187, 189.)[1] The jury found true the special circumstance allegations of multiple murder and murder during the commission of robbery. (§ 190.2, subd. (a)(3) & (17)(A).)[2] At the penalty phase, the jury returned a verdict of life without the possibility of parole for Gonzales on counts 4 and 5 and hung on all other penalty phase verdicts. At the penalty phase retrial, a new jury returned a verdict of death for Gonzales on

---

[1]   All further statutory references are to the Penal Code unless otherwise indicated.

[2]   Both defendants were also found guilty of robbery (§ 211), and of criminal street gang (§ 186.22, subd. (b)(4)) and personal gun use (§ 12022.5, subd. (a)) enhancements for the robberies and murders.

count 1, a verdict of life without the possibility of parole for Soliz on count 1, and a verdict of death for Soliz on counts 4 and 5.  The trial court denied defendants' motions for a new trial (§ 1181) and for modification of the penalty (§ 190.4, subd. (e)), and sentenced them to death.  This appeal is automatic.  (Cal. Const., art. VI, § 11; Pen. Code, § 1239, subd. (b).)

We affirm the judgments.

## INTRODUCTION

Defendants were members of the Puente gang, a Hispanic street gang in the City of La Puente.  They were charged with two separate sets of murders.  In the first, Lester Eaton was killed while defendants robbed the small neighborhood store he owned, the Hillgrove Market.  Gonzales's fingerprints were found on items in the getaway vehicle.  The testimony of witnesses to defendants' actions before and after the robbery-murder linked both defendants to the crime.  Additionally, in separate, taped conversations, each defendant admitted having participated in the robbery, and Gonzales admitted he was the shooter.  The victims of the second set of murders were Elijah Skyles and Gary Price, African-American teenagers who were shot numerous times at a gas station.  The prosecution theorized defendants killed Skyles and Price in retaliation for the murder of a member of the Puente gang two weeks earlier by members of the Neighborhood Crips gang.  Several eyewitnesses identified Soliz as the shooter, with Gonzales providing backup.  In a tape-recorded conversation, however, Gonzales said he had been the sole shooter and sole participant in the Skyles and Price murders.  At the penalty phase, the jury returned a verdict of life without the possibility of parole for Gonzales for the Skyles and Price murders, but could not reach a verdict as to Gonzales for the Eaton murder or as to Soliz for either set of murders.  At the penalty retrial, Gonzales took the stand for the first time in the proceedings, admitted he had shot Eaton during the Hillgrove Market robbery, and

2

reiterated that he had been the shooter and sole participant in the Skyles and Price murders (as he stated in the taped conversation). The jury returned a verdict of death for Gonzales for the Eaton murder, a verdict of death for Soliz for the Skyles and Price murders, and a verdict of life without the possibility of parole for Soliz for the Eaton murder.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Case

##### a. The Murder of Lester Eaton

###### (1) Robbery and Murder at the Hillgrove Market

Lester and Betty Eaton, married for 43 years, owned and operated the Hillgrove Market on Clark Avenue in Hacienda Heights, an unincorporated part of Los Angeles County near the City of La Puente. As Betty Eaton testified, she and Lester were alone in the market about 7:30 on the evening of January 27, 1996. Lester was talking on the phone in a back room (the meat-cutting room) near the sink and Betty was up front behind the meat counter. Two young men entered the market; the first pointed a gun at Betty and asked, "Where do you keep your money?" He appeared to be Hispanic and between 18 and 20 years old. He wore a close-fitting cap that covered his hair and a bandanna that covered his face from the nose down. The second man pointed a gun at Lester, who said, "Put that thing down before someone gets hurt." The second man was also Hispanic, in his late teens or early 20's. He did not wear either a bandanna or a hair-covering. Betty saw the second man primarily from the back and testified that she would be unable to recognize either of the men if she ever saw them again.

The second man pinned Lester against the sink and struck him, causing blood to flow from his forehead. The next thing Betty saw was Lester lying on the

3

floor in a fetal position behind the meat counter. She heard two gunshots and knew he had been shot. Betty panicked and ran out through the front door of the market. She saw a dark blue van parked in front. As she ran towards a neighbor's house, she heard the squealing of tires from a vehicle and thought the robbers were coming after her. She pounded on the neighbors' door until they opened it, ran in and dialed 911. She returned to the market as the first patrol car was pulling up. The blue van that she had seen parked in front was gone. When sheriff's deputies later drove her from the market to the sheriff's station, she saw what appeared to be the same blue van now parked at the corner of Clark Avenue and Turnbull Canyon Road.

### (2) The Crime Scene Investigation and Autopsy

Responding to a patrol dispatch, sheriff's deputies found Lester Eaton lying on the floor behind the Hillgrove Market's meat counter in a large pool of blood, with a bullet wound to his back. Five minutes later, paramedics arrived, examined Lester and pronounced him dead. His left front trouser pocket had been pulled inside out, and he was wearing an empty holster on his belt. Despite a thorough search, no expended shell casings were found at the crime scene, which led one of the investigating officers to infer that the weapon used was a revolver, not an automatic or a semiautomatic weapon, which eject their casings when fired. Lester's shotgun and his revolver, a Colt, which he wore in the holster on his hip, had been taken from the store, as had his wallet. Personal items from his wallet were later discovered nearby scattered along the road. The market's cash register was on the floor, and the money tray was missing, along with the day's proceeds (about $100 in cash plus food stamps). Weeks later, while cleaning up the market, Betty found an expended bullet, which she gave to investigators.

4

The medical examiner found five gunshot wounds to Lester's body: two to the head and three to the chest (of which one was significant and two were superficial). The two wounds to the head and the significant chest wound were consistent with the victim's having sat on the floor with the shooter standing over and behind him. One of the head wounds and the significant chest wound were fatal; the other head wound was serious and possibly fatal. One wound to the head had been caused by a bullet fired at close range, from between half an inch and 18 inches away; the other was a near-contact wound shot from within half an inch. There was a laceration to the head caused by blunt force trauma, consistent with having been struck by the barrel of a gun.

### (3) Contents of the Getaway Vehicle

Patrol officers found the getaway vehicle, a blue 1993 Chevrolet Astro van, parked two to three blocks away from the market on the corner of Turnbull Canyon Road and Clark Avenue. The van had been reported stolen, and the passenger-side window was broken out. Inside, investigators found a cash register tray and food stamp coupons. At trial, Betty Eaton identified the cash register tray found in the van as the one taken from the market. She also identified three receipts (bearing her handwriting and that of a customer) found in the van as being from her cash register. Other items found in the van included an unexpended bullet, a Raiders jacket and various pieces of paperwork unconnected to the market. Fingerprints on two of the pieces of paperwork were identified as those of defendant Gonzales.

### (4) Dorine Ramos and Events Before the Robbery Murder

Earlier on the day of the murder, Dorine Ramos was running errands with her friend Rosemary. Rosemary's boyfriend, Randy Irigoyen, was driving the two in Rosemary's car. As former gang member Salvador Berber later testified at trial,

5

Irigoyen and defendants Gonzales and Soliz were members of the Perth Street gang, which was a "clique" (subgroup) of the Puente criminal street gang. Irigoyen suggested to Ramos that she should get her own car and took her to look at two vehicles he said she could have "for cheap." The second vehicle he showed her was a blue Astro van, which she later testified looked like the getaway vehicle later used for the Hillgrove Market robbery murder. Ramos told Irigoyen she was not interested in buying either vehicle, and he then drove them to a nearby house.

Ramos stayed in the car while Irigoyen joined a group of about 10 men gathered in front of the house. They ranged in age from 18 to 29 years old and all had similar, very short haircuts, which Ramos described as being "cholo" (gangster) style. Ramos saw defendants Gonzales and Soliz among the group. Defendants told Irigoyen that they needed a "cuete" (Spanish slang for a gun). They said they were going to do a "jale" (slang for a criminal job) with the "cuete." Soliz indicated that he and Gonzales were waiting for a ride to go pick up a van. A Honda Prelude drove up to the front of the house and Irigoyen handed the driver a gun. The driver said, as he drove away, that he had to get another gun. Irigoyen gave bandannas to Gonzales and Soliz, who wrapped them around the lower part of their faces. Gonzales was carrying a Raiders jacket, similar to the one later recovered from the van after the Hillgrove Market robbery-murder. When the Honda Prelude returned about 6:30 p.m., defendants got in and drove off. About five minutes later, Irigoyen drove Ramos home. They drove past the location where the blue van had earlier been parked, but it was gone. Later that night, Ramos saw a news broadcast about the Hillgrove Market robbery murder showing the same blue van she had seen earlier that evening. She contacted the police two or three days later.

6

## (5) Testimony of Richard F. Alvarez

Richard F. Alvarez knew defendants Gonzales and Soliz; Alvarez's brother was married to Gonzales's sister. On the night of the murder, between 7:00 and 8:00 p.m., Alvarez received a call from Gonzales, who asked Alvarez to pick him up from the corner of Seventh Street and Turnbull Canyon Road. Alvarez drove there and picked up Gonzales and Soliz, along with a third individual he knew as "Clumsy" (whose real name was Michael Gonzales). Alvarez dropped the three men off at the house of a woman named Jennifer, where Alvarez and defendants remained the rest of the night partying.

Deputy Woodrow West was a homicide investigator who testified about an interview he had with Alvarez some time after the Hillgrove Market robbery-murder. West testified that Alvarez initially denied any knowledge of the robbery murder, but eventually admitted that between 6:00 and 7:00 p.m. on the night of the crime he had received a phone call from defendant Gonzales, who asked to be picked up at Jennifer's house. Alvarez met defendants and "Clumsy" at Jennifer's house and followed them in his car while they drove a blue van to a location on Turnbull Canyon Road in Hacienda Heights. Alvarez was told to wait while the three men left in the blue van. They returned a short time later, parked the van, and got into Alvarez's car. Alvarez drove them back to Jennifer's house where they partied the rest of the evening. At trial, Alvarez denied he told Deputy West he had dropped the three men off before the robbery and waited for them. Alvarez insisted he had only picked the men up after the robbery.

On March 15, 1997, Alvarez visited defendant Gonzales, who was incarcerated in the county jail. Their conversation was secretly taped by the authorities and later played for the jury. In the tape, Alvarez alluded to the fact that at defendants' preliminary hearing, a witness named Kimberly had mentioned Alvarez by his nickname, "Richie Rich," as the person who had driven defendants

7

and Clumsy to the intersection on Turnbull Canyon Road before the robbery of the Hillgrove Market. Gonzales told Alvarez not to worry because many people had the nickname "Richie Rich."

### (6) Soliz's Taped Conversation with Luz Jauregui

On October 19, 1996, a local newspaper ran a story on the Hillgrove Market robbery murder, stating that Gonzales had been arrested and two more suspects were being sought. On December 15, 1996, Luz Jauregui, Soliz's fiancée, visited him in the county jail where he was incarcerated on an unrelated charge. Their conversation was secretly recorded by the authorities and played to the jury. Soliz told Jauregui that he was growing his moustache because "they said these fools are young that did this shit. I got some glasses. I'm gonna let my hair grow a little, comb it when I start to court, put on a suit and tie." Referring to the newspaper article on the robbery murder, Soliz stated: "It says . . . they got two more suspects. They haven't found 'em yet? Damn, they got one of 'em right here. 'But your honor, I'm a changed man.' "

### b. The Murders of Elijah Skyles and Gary Price

### (1) Events Preceding the Murders

Vondell McGee was with Elijah Skyles and Gary Price just before they were killed around 12:40 a.m. on April 14, 1996. After finishing his work shift at a Chuck E. Cheese restaurant, McGee met Price, his cousin, and Skyles, his friend, and walked with them to a nearby Shell gas station located on the corner of San Bernardino Road and Azusa Avenue in the City of Covina, where they talked for a while. Skyles was 15 years old and Price was 18 years old. McGee saw a tan Honda Accord (1989-1991 model year) pull into the gas station. McGee later identified a photograph of Augustin Mejorado's car as depicting a car like the one

8

he saw that night.[3] The car had about five people in it, who appeared to be Hispanic. The car stopped for a moment, and several people in the car stared at Skyles, Price and McGee; the car then turned and drove off. McGee talked with Skyles and Price for about another five minutes. He gave them some change for the pay phone, then left for home on his bike.

About a minute or two later, as McGee was bicycling through the parking lot of a nearby shopping center, he heard about 10 or 12 gunshots. McGee stopped, ran for cover, then made his way home, where he paged Price. Without waiting for a response, McGee bicycled back to the gas station and found Skyles and Price lying dead on the ground next to each other near the pay phone. About five minutes had elapsed from the time McGee first heard the gunshots; police officers were already at the scene. It was a clear night and the gas station was well lit, including the area around the pay phone.

### (2) Eyewitness Carol Mateo

Between 12:40 and 12:45 a.m. on April 14, 1996, Carol Mateo was driving on San Bernardino Road near the intersection with Azusa Avenue. Her brother, Jeremy Robinson, was in the front passenger seat, and her husband Jose Mateo, was in the backseat. She heard a series of loud popping sounds (more than five and fewer than 12) and slowed down, thinking something was wrong with her car. Robinson then screamed, "Oh shit. Look over there at the gas station. That guy's shooting those guys." He pointed towards the gas station. She looked and saw a man shooting two African-American teenagers in the payphone area of the gas station. She estimated she saw this from a distance of 50 feet, while her car was either at a full stop or barely moving. The shooter, a Hispanic male, about 20

---

[3] As recounted below, defendants rode in Mejorado's car to the gas station.

9

years old, five foot seven to five foot eight inches tall, of medium build, with a very short hair style, was standing about four to five feet away from his victims and had his arm extended at shoulder length. She identified the shooter in court as defendant Soliz.

Mateo saw both victims fall after they were shot. One of the victims wore a dark blue-and-black checkered flannel shirt. After he fell, he tried to crawl away, but Soliz walked up and shot him again. After Soliz stopped firing, he turned and looked in Mateo's direction for about three to five seconds, and she saw the front of his face. Soliz then turned around and ran to a car parked in the gas station, a beige-colored Honda Accord. Mateo testified that the car in a photograph of Augustin Mejorado's car looked like the car she saw. She also saw defendant Gonzales standing by the car, and identified him in court. At the time of trial, Gonzales had longer hair and was wearing glasses. Mateo testified that Gonzales's appearance in a photograph with short hair was similar to how he looked on the night of the murder.

Mateo drove to the Chuck E. Cheese restaurant on Azusa Avenue and called the police from an outside pay phone. As she was doing so, she saw the same car she had seen at the gas station pull in and then go immediately back out of the driveway. She saw defendants in the front seats of the car. When interviewed by investigators, she selected Soliz's photograph out of several shown to her. At defendants' preliminary hearing, she identified Soliz as the shooter.

### (3) Eyewitness Jeremy Robinson

Carol Mateo's brother Jeremy Robinson, who was a passenger in her car that night, testified he heard shots and saw the shooter, whom he described as being Mexican, about 22 years old, five feet eight inches in height, and having a shaved head. In court, Robinson pointed to Soliz as looking familiar and like the

10

shooter. The car the shooter entered at the gas station was an early 1990's beige Honda Accord, which Robertson testified looked like that in the photograph of Augustin Mejorado's car. During the investigation, Robinson was shown three sets of six photographs and identified a photograph of Soliz as looking like the shooter. Robinson was unable to identify Soliz at the preliminary hearing.

*(4) Eyewitness Alejandro Garcia*

On the night of the murder, Alejandro Garcia was working at the 24-hour Shell gas station on the corner of San Bernardino and Azusa in Covina. About 12:40 a.m., Garcia was inside the office area of the gas station talking on the phone when he heard more than five gunshots coming from the eastern side of the lot, where the bathrooms and phones were located. Garcia looked through the office windows towards the bathroom area and saw two people running toward a car. They both got into the backseat of the car, a four-door, gray 1990 Honda. The two men were Hispanic. One of the men, who appeared to be about 20 years of age, with very short shaved hair, used the driver's side rear door. He was carrying a small bag about the size of a handgun. The car was full of people, one of whom was a woman sitting in the back. Before the shooting, Garcia had seen the car drive by and saw two people in the front and three in back, including the woman. The car looked like that in the photograph of Augustin Mejorado's car. Before trial, Garcia was shown five sets of six photographs and identified a photograph of Soliz as looking like the shooter. At trial, Garcia was unable to identify anyone in the courtroom as the shooter.

*(5) Eyewitness Judith Mejorado*

Judith Mejorado was the sister of Augustin Mejorado, who was the owner of the Honda Accord identified as the car involved in the gas station shootings. At trial, Judith stated she did not recall any of the events at the gas station. The court

11

declared her a hostile witness and found that she had feigned her failure of recollection. Consequently, her testimony about the shootings was presented through her preliminary hearing testimony and her pretrial interviews with investigators.

On the night of the murders, Judith arrived at the gas station with her brother Augustin in his car, a four-door, silver Honda Accord. "Clumsy" was driving the car; Judith was in the middle of the front seat, and her brother was in the front passenger seat. Gonzales and Soliz were in the backseat. Clumsy was driving because Augustin was too drunk to drive. Judith saw three young African-American men standing in the driveway in front of the gas station. Defendants indicated they knew those men and asked Clumsy to go back so they could talk to them. Clumsy drove the car into the gas station near the telephone where two of the men were now standing and stopped in front of the telephone. Gonzales and Soliz got out through the rear doors of the car and went to talk to the two men. Gonzales stayed closer to the car than Soliz. Judith heard Gonzales and Soliz and the two African-American men all talking loudly. Suddenly, loud gunshots interrupted the conversation. It sounded to her like just one gun. She could see the hand of the shooter and the sparks coming from the gun, but she could not see his face. However, she knew Soliz was the shooter because the shooter used the left side (driver's side) rear door to reenter the car, and that was the side Soliz used. Gonzales used the right side (passenger side) rear door. Defendants then told Clumsy to "take off."

Deputy Sheriff David Castillo investigated the Skyles and Price murders and interviewed Judith in November of 1996. Her account of the shootings in this interview was substantially the same as her preliminary hearing testimony, with the following additional details: Gonzales had a gun in his possession at the time of the shooting, although he did not fire it. Defendants were arguing near the pay

12

phones with the two African-American men, one of whom she heard say, "No. I didn't mean to do you that way. I'm sorry. I didn't mean to do you that way." Soliz responded with some statements and the gunshots followed. When defendants got back in the car after the shooting, they told her: "You didn't see nothing. You don't know nothing."

### (6) Crime Scene Investigation and Autopsy

An investigating officer arrived at 12:48 a.m. and found Skyles and Price lying dead on the ground. Skyles was wearing a long sleeve black and white checkered shirt, red pants, and a red belt with the letter "P." In the opinion of one of the investigating detectives, Skyles's clothing was consistent with that of a "Bloods" gang member. Bloods gang members commonly wore the letter "P," which stands for Piru, a street in the Compton/Willowbrook area of Southeast Los Angeles where the original Bloods gang members lived. Price wore a light blue windbreaker jacket and blue baggy pants. Blue baggy clothing was consistent with membership in the "Crips" gang. At the scene, investigators recovered 11 expended shell casings from a nine-millimeter weapon.

Skyles's autopsy showed nine gunshot wounds, eight of which were nonfatal. The fatal wound was a shot that entered on the left side of his back and travelled through his vital organs. The trajectory of the fatal wound was consistent with Skyles's having been shot from behind while kneeling on the ground with the shooter standing over him. Price had seven gunshot wounds, including two fatal wounds to the head and one to the abdomen.

### (7) Taped Conversation Between Gonzales and Augustin Mejorado

On March 29, 1997, Augustin Mejorado visited defendant Gonzales who was incarcerated in the county jail. Authorities secretly recorded their conversation, which was played to the jury at trial. As recounted above, Augustin

13

was the brother of Judith Mejorado. Judith had been a passenger in the car at the gas station and witnessed the shootings of Skyles and Price; she had testified at the preliminary hearing about the shootings and described defendants' involvement. Augustin asked Gonzales what he wanted Augustin to do about Judith, in light of her testimony at the preliminary hearing. Gonzales told Augustin he wanted Judith "to lie," "to change it around," or say that she had not even been present at the shooting.

### (8) Defendants' Refusal to Stand in a Lineup

On March 4, 1997, Carol Mateo and Jeremy Robinson, the witnesses who had seen the shooting while driving by the gas station, went to the county jail to view a live lineup. Defendants were asked to stand in the lineup but refused to do so, and consequently neither witness saw a live lineup.

### (9) Gonzales's Taped Conversation with Salvador Berber

Salvador Berber was a former member of the Puente gang. He had known defendant Gonzales for about 10 years, defendant Soliz for about eight years, and Augustin Mejorado for about two years. He knew all three as members of the Perth Street clique of the Puente gang. At some time before Berber's arrest for robbery in July 1996, Berber had talked to Gonzales about buying a .38-caliber gun from him. Berber asked Gonzales whether the gun was "dirty," that is, whether it had been used in a crime. Gonzales said that he had two .38-caliber guns, one that had been used to murder a man at the Hillgrove Market, and another that he took from the murdered man. Gonzales mentioned that Soliz had been with him during the robbery murder.

Berber was facing 10 to 17 years of imprisonment for the robbery charge against him because he had a prior robbery conviction. Hoping to receive leniency from the authorities, after his arrest Berber told a detective what Gonzales had said

14

about the Hillgrove Market robbery murder. The detective made no promises to Berber, and Berber was transported to the county jail, where he ran into Gonzales, who was also incarcerated there. In the county jail, Gonzales made similar statements to Berber about the Hillgrove Market robbery murder. Berber again contacted homicide detectives and agreed to wear a "wire" (i.e., an audio recording device) to record his conversation with Gonzales when they were transported together in a sheriff's van.[4]

On September 25, 1996, Berber, wearing the wire, rode with Gonzales in the sheriff's van from the Los Angeles County jail to the Pomona courthouse. The two prisoners were alone together in the back of the van. The trip lasted about one and a half to two hours, during which time Gonzales talked about the two sets of murders (the Eaton murder and the Skyles and Price murders), as well as matters unrelated to those crimes. An edited version of the conversation that included all of Gonzales's statements about the two sets of murders was played for the jury, and a transcript was provided.[5]

In the tape, Berber asked Gonzales if he thought Soliz's fingerprints were on the van used for the Hillgrove Market robbery murder. Gonzales replied that the police were trying to get Soliz for the murder of the two African-American teenagers (the "terrones"). Gonzales said that they had used Augustin Mejorado's car for that. Augustin and his sister, Judith, had been sitting in the front seat, and Gonzales, Soliz and "Clumsy" were also in the car. Gonzales described how he

---

[4] Berber received a plea bargain that required him to testify in defendants' case. He was given a suspended sentence and placed on five years' probation.

[5] The defense also made available to the jury a tape and transcript of the complete conversation. The unedited tape included conversation unrelated to the case and stretches of road noise lasting as long as 20 minutes.

ran up to the African-American teenagers (the "tintos") by the telephone pole and shot them. When Berber mentioned that the police might have found Soliz's fingerprints on the telephone pole, Gonzales stated that Soliz "didn't get out" of the car, and that "It was just me — the only one that got out." Gonzales said that when he got back in the car, he said, "Sorry, Judith, you had to see that." When she asked whether he had killed them, he said, "yeah."

Berber mentioned that he would have bought both of the .38-caliber guns that Gonzales had once offered for sale. Gonzales responded that he had sold both and that one of them was "what we killed the old man with." The other gun "was the old man's *cuete* [gun]" and had his initials on it, which they scratched off. Gonzales stated, "I done about three — two niggers and that old man — about four motherfuckers when I got out this time."[6] Gonzales referred to a "meat market" in Hacienda Heights by Turnbull and Seventh. They had worn hoods and sweatshirts during the robbery. They stole between $200 and $300 and took the cash tray. Gonzales said that the old man had tried to reach for his gun, and that Gonzales wrestled with him, grabbed his gun, and started hitting him with the other gun. Gonzales tried to shoot him, but the gun's cylinder had popped up and it would not fire. When the grocer was on the ground, Gonzales managed to shoot him in the face. Richard Alvarez had parked his car a half-block away and they switched from the van to Alvarez's car after the robbery.

Gonzales also mentioned a newspaper story he had read about the robbery murder: "They tried to make him [Lester Eaton] out to be, 'Oh, he's more, he's more than a butcher, more like a' — motherfucker — 'more than a father figure,

---

**6**     Gonzales's reference here to a fourth murder victim was never explained at trial.

16

too.  He wasn't only a butcher, but a father figure, too.'  Says in the paper.  I don't want to hear that bullshit.  Smoke the motherfucker."

### (10)  Ballistics Evidence

A firearms examiner for the Los Angeles County Sheriff's Department examined the 11 expended nine-millimeter shell casings found at the Skyles and Price murder scene and determined they were all fired by the same firearm.  She then compared those 11 shell casings with the unexpended nine-millimeter bullet found in the getaway van used in the Hillgrove Market robbery murder.  She determined that this unexpended nine-millimeter bullet was from the same gun magazine as the 11 shell casings found at the Skyles and Price murder scene.[7]

The bullets recovered from the body of Lester Eaton all had markings consistent with having been fired from the same gun, the caliber of which would have been a .38 special or a .357 magnum, probably a revolver.

### (11)  The Murder of Billy Gallegos as Motive for the Murder of Skyles and Price

Gabriel Urena testified about a gang killing that occurred two weeks before the shooting of Skyles and Price that may have instigated the latter shooting.  Urena was a passenger in a car driven by Billy Gallegos when Gallegos was shot and killed on March 31, 1996.  According to Urena, Gallegos was a member of the Ballista clique of the Puente gang.  Gallegos was driving in the City of La Puente when another car pulled up alongside him.  Two African-American men were in the car, and they "threw a gang sign" of the letter N, which stands for

---

[7]  As the firearms expert explained, it is possible to load a bullet into a gun magazine and then remove it without firing it.  This will leave the identifying marks from the individual gun magazine on the unexpended bullet.

"Neighborhood Crips." They then fired three shots at Gallegos, who crashed his car into a brick wall and later died of gunshot wounds to the head.

### (12) Gang Expert Testimony

Detective Scott Lusk, a homicide detective from the Los Angeles County Sheriff's Department, testified as a gang expert. Lusk had eight years' experience as a police officer interacting with the Puente gang, which he described as being based in the City of La Puente with a primarily Hispanic membership. In Lusk's opinion, the Puente gang's primary purpose was to commit crimes and further its reputation on the streets. Cliques are subgroups within a gang. Among the Puente gang cliques were Perth, Dial and Ballista (named after streets in La Puente). Detective Lusk identified both defendants in court. He had had about 20 to 30 past encounters with defendant Gonzales and about five to 10 past encounters with defendant Soliz. In Lusk's opinion, both defendants were members of the Perth Street clique of the Puente gang and had been so continuously from at least 1990 to the time of the trial, which included the year 1996, when the Eaton and Skyles and Price murders were committed. Both defendants had several tattoos on their bodies indicating their Puente gang membership.

In Lusk's opinion, the Hillgrove robbery murder was a good example of a crime that enhanced both an individual gang member's reputation within the gang, and the gang's reputation within the gang hierarchy. Because this was a particularly violent crime, the person who committed it would be regarded as a "vato loco" (crazy guy), which would enhance his reputation.

In Lusk's opinion, the murders of Skyles and Price were probably a gang retaliation killing motivated by the earlier killing by Crips gang members of Billy Gallegos, a Puente gang member. According to Lusk, whether Skyles and Price had actually been involved in the Gallegos murder, or whether they were actually

18

members of the Crips gang or any street gang was irrelevant. Victims of gang retaliation shootings are targeted for being found within the general area of the rival gang, for being of a certain race, and for wearing a certain style of clothing.

In Lusk's opinion, a gang member who only provided backup for a shooting might brag to another gang member and take credit for being the actual shooter. The gang member providing backup would consider himself part of the crime because he was there to provide aid and to make sure his partner did what he was supposed to do.

### 2. Defense Case

Neither defendant testified in his own defense. Gonzales rested without presenting any evidence on his behalf.

In an effort to cast doubt on the eyewitness identifications, counsel for Soliz called Sergeant Holmes, who had been an investigating officer in the case from the beginning. Sergeant Holmes testified that photographs of the crime scene, taken from the perspective of the various witnesses to the shooting, had been made several hours after the incident, no later than 4:00 a.m., while it was still dark. Sergeant Holmes further testified that when he prepared the photographic lineup pack that included Soliz's photograph, he selected individuals who had short hair like Soliz for the other photographs in the pack.

### B. Penalty Phase

There were two penalty phases. In the first, as to Gonzales the jury returned a verdict of life without the possibility of parole for the murders of Skyles and Price (counts 4 and 5) and hung on penalty as to the murder of Lester Eaton (count 1). As to Soliz, the jury hung on penalty as to all of the murder counts. A new penalty retrial jury was empanelled, which returned a verdict of death for

19

Gonzales for the Eaton murder and a verdict of death for Soliz for the Skyles and Price murders.

### 1. Prosecution Case

In the penalty retrial, the prosecution presented all the witnesses it had presented in the guilt phase in order to convey the circumstances of the crime to the new penalty jury. In addition, the prosecution presented the following evidence in aggravation.

#### a. Victim Impact Evidence

Betty Eaton, wife of murder victim Lester Eaton, testified about her husband's role in the community and the devastating effect his murder had on her and her family. Lester often gave credit to his customers who were short on cash, even though he was not repaid in many instances. He sponsored local youth sports teams and the local high school band. Betty Eaton struggled to keep the market going and was constantly tormented by memories of her husband and how he was killed.

#### b. Other-crimes Evidence as to Gonzales

On March 11, 1990, when Gonzales was 13 years old, he robbed a gas station with his cousin. Gonzales carried a knife and his cousin carried a gun. They took money from the gas station employees as they were preparing to count it at the end of the shift. Gonzales confessed to an officer investigating the crime, and his fingerprints matched those taken from the crime scene.

On January 4, 1998, while Gonzales was incarcerated at the Los Angeles County Men's Central Jail, a search of his cell revealed a sharpened four-inch metal shank inside an envelope addressed to Gonzales. The possession of a shank by an inmate is illegal.

The parties stipulated that Gonzales was convicted on October 5, 1995, of felony possession of a controlled substance.

### c. Other-crimes Evidence as to Soliz

On October 16, 1997, in the Men's Central Jail, a deputy sheriff responded to a fire on one of the cellblock rows. The fire was fueled by a burning newspaper and a smoldering mattress in the back of the row, and had spread to four cells. Several inmates, including Soliz (whom the deputy identified in court), threw paper onto the fire to keep it going. When the deputy attempted to extinguish the fire using a fire extinguisher, these same inmates, including Soliz, pelted him with fruit and full milk cartons. Deputies eventually put out the fire with a fire hose.

On two separate occasions in 1998, while Soliz was incarcerated at the Men's Central Jail, sheriff's deputies discovered several razors and altered razors in his single-man cell. These items are contraband in the jail, as razors can be fastened to a toothbrush or pencil and used as a slashing device.

It was stipulated that on November 10, 1992, Soliz was convicted of the felony of the unlawful driving or taking of a vehicle.

### 2. Defense case

#### a. Gonzales

##### (1) Testimony of Gonzales

Against the advice of counsel, Gonzales testified on his own behalf. At the time he testified (in 1998), he was 22 years old. He had joined the Perth Street clique of the Puente gang when he was 13 or 14 years old and had been shot when he was almost 15. Gonzales had had a happy childhood with his family. Although several of the people he hung around with in the neighborhood belonged to gangs, no one forced him to join a gang.

21

He testified that he planned only to rob the Hillgrove Market, not to murder anybody there. He entered the market with a gun, walked straight to the back, and demanded money from Lester Eaton. He saw Eaton reach for his gun and the two started wrestling. They were both on the ground, each with a gun, and Gonzales's mind went "blank" and he "kept shooting." Afterwards, Gonzales "felt bad" about what happened. He acknowledged that he appeared to be bragging about the murder in his taped conversation with Salvador Berber, but stated that was because he could not look like a coward in front of Berber, a fellow gang member. He stated that he had not apologized personally to Eaton's family and friends, but that he would like to apologize because he felt bad and it was always on his conscience.

Gonzales testified he was the one who had shot Skyles and Price at the gas station. When he had first seen them as he was driving by, he thought he recognized them, and he wanted to talk to them about the gang-related killing of a friend that had occurred in the previous couple of weeks. Gonzales got out of the car to talk to Skyles and Price, but Soliz remained in the car. An argument started, and Gonzales thought one of them was reaching for a gun, so he shot both of them. He now felt bad about it.

On cross-examination by the prosecutor, Gonzales gave the following testimony: Soliz was with him at the Hillgrove Market robbery murder. Gonzales had a .38-caliber revolver and Soliz had a nine-millimeter handgun. "Clumsy" drove the van, a stolen vehicle abandoned after the robbery. Richard Alvarez waited for them down the street to drive them away after they abandoned the van. Gonzales acknowledged he had taken away Eaton's gun before shooting him. Gonzales maintained, however, that he had fired all the shots in the heat of the moment: "I just went blank and kept shooting." He acknowledged that after the

22

murder he had "part[ied] for a couple of days" but maintained he felt bad about the killing at the time.

When Gonzales approached Skyles and Price at the gas station, he wanted to talk to them about the murder of Billy Gallegos, who had been a friend of Gonzales and a member of the Ballista clique of the Puente gang. The word on the street, which Gonzales had heard, was that Gallegos had been shot by two African-American gang members from the Neighborhood Crips gang. Gonzales shot Skyles and Price with a nine-millimeter gun, the same gun Soliz had carried at the Hillgrove Market robbery and murder but which Soliz had returned to him a couple of weeks before the murder of Skyles and Price.

Counsel for defendant Soliz cross-examined Gonzales further about the Skyles and Price shootings. Gonzales reiterated that he alone got out of the car and shot Skyles and Price with the nine-millimeter gun. When he approached Skyles and Price, Gonzales "knew" they were gang members, and he thought it likely they had heard something about the Billy Gallegos murder, although he did not necessarily think they had been involved. Gonzales took his gun with him for protection. The conversation started out civilly enough with each asking the other where they were from. Then they said, "Fuck Puente," and made a move that made him think they had a gun. He reacted by shooting both of them.

On recross-examination, the prosecutor asked Gonzales why he fired a total of 11 shots at Skyles and Price. Gonzales first stated the trigger of his semiautomatic gun had been rigged, turning it into an automatic weapon, and that one pull produced continuous shots. After the trial court took judicial notice that it was physically impossible to rig a semiautomatic weapon in the manner Gonzales described, Gonzales stated he had kept pulling the trigger, but did not remember how many times. He shot Skyles and Price while they were falling, but not after they hit the ground.

23

*(2)  Family and Friend Testimony*

Several of Gonzales's family members and a neighbor testified about Gonzales's good side and expressed the hope that he would receive a life sentence.

Gonzales's mother, Edna Gonzales, testified that through junior high school, Gonzales received good grades and was close to her.  During junior high school he joined a gang.  She visited him every week in jail, and he wrote her letters, including a poem for Mother's Day.

Gonzales's sister, Valerie Gonzales, testified that when Gonzales was young he liked to play football.  When he was 14 years old, he joined a gang and was later shot and taken to the hospital.  She and her seven-year-old daughter visited him every week in jail and he wrote to them.

Gonzales's sister, Francis Ontiveros, testified that Gonzales would sometimes take care of her daughter, who had Down Syndrome, while Francis was at work.  Her daughter loved him, and Francis took her to visit him in jail.

David Gonzales, Jr., Gonzales's nine-year-old nephew, expressed his love for his uncle and described how he frequently talked to him on the phone.

William Marmolejo, one of Gonzales's neighborhood friends, testified that he played sports with Gonzales while they were growing up together.  Marmolejo's younger brother encouraged Gonzales to join a gang.  Marmolejo believed Gonzales had a good side and was pushed into a life of crime.

*b.  Soliz*

Soliz did not testify on his own behalf.  Several family members and a coworker testified about his good side and expressed the hope that he would receive a life sentence.

Soliz's mother, Irene Arizola, testified that she was a single mother and raised Soliz together with his two sisters and two brothers.  As a child he had a variety of pets and was very good with his animals.  She was very close to Soliz as

24

a child, but their relationship grew more distant when he was in high school and he joined a gang at the age of 15.

Soliz's fiancée, Luz Jauregui, testified that she was 21 years old and had been romantically involved with Soliz for over three years. She described him as a very supportive and loving person. He was not involved with a gang during the three years they had been together, although she acknowledged in cross-examination that the murders of Lester Eaton and Skyles and Price had taken place during this time period.

Soliz's older brother, Tony Diaz, worked fulltime as a machinist and part time as an ordained minister. Diaz felt he had been a bad influence on Soliz as an older brother, and described how it was Soliz who initially helped Diaz get involved with the church. Diaz described Soliz as capable of showing loyalty and love, and believed Soliz could learn from his mistakes and be a help to other men in prison.

Soliz's cousin Danny Laura testified that he grew up in the same neighborhood with Soliz and they were very close. Danny was aware that Soliz had joined a gang, but Soliz never behaved differently towards him.

Soliz's cousin Steve Laura (Danny Laura's younger brother) testified that he also grew up with Soliz and was close to him. Soliz had helped him avoid joining a gang because Soliz expressed negative views about gangs. In Steve's opinion, Soliz became part of a gang because so many of his friends were involved that it "overcame him."

Michael Landerman worked with Soliz at a machine shop for two to three years, from approximately 1989 to 1991, and they were friends. Soliz was very helpful to Landerman in training him, and Landerman believed that Soliz would be helpful in prison to other prisoners.

Nancy Cowardin, who held a Ph.D. in educational psychology, examined Soliz on two separate occasions in April 1998. She assessed him for learning disabilities but found no signs of attention deficit disorder, and she characterized his intellectual abilities as above average. She administered the Kohlberg moral reasoning test, which presents three moral dilemma scenarios. Based on Soliz's answers, she assessed him at stage three, which is the lower of the two average adult American stages of moral reasoning.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. Denial of Severance Motions

Defendants filed pretrial motions to sever count 1 (the Eaton murder) from counts 4 and 5 (the Skyles and Price murders). Defendants contend the trial court erred in denying their motions to sever the two sets of murder counts and thereby violated their federal due process rights and corresponding rights guaranteed by the California Constitution.[8] As we conclude below, the trial court properly denied the motions.

---

[8] Regarding this claim and other claims raised on appeal, defendants contend the asserted error or misconduct violated several constitutional rights. In many instances in which either or both defendants raised issues at trial, however, they failed explicitly to make some or all of the constitutional arguments they now assert on appeal. Unless otherwise indicated, these appellate claims either required no action by defendants to preserve them, or involved application of the same facts or legal standards defendants asked the trial court to apply, accompanied by new argument to the effect that the trial error or misconduct had the additional legal consequence of violating the federal Constitution. To that extent, defendants have not forfeited their new constitutional claims on appeal. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1084-1085, fn. 4.) On the merits, no separate constitutional discussion is required, or provided, when the rejection of a claim that the trial court erred on the issue presented to that court necessarily leads

*(footnote continued on next page)*

26

Section 954 provides that "[a]n accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts," and that "the court . . . in the interest of justice and for good cause shown, may, in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ." Defendants' murder counts were of the same class and, accordingly, joinder was permissible. (*People v. Catlin* (2001) 26 Cal.4th 81, 110.) We review a trial court's decision not to sever counts for abuse of discretion based on the record when the motion was heard. (*People v. Cook* (2006) 39 Cal.4th 566, 581.) But even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts resulted in gross unfairness depriving the defendant of due process of law. (*People v. Rogers* (2006) 39 Cal.4th 826, 851.)

The party seeking severance has the burden to establish a substantial danger of prejudice requiring the charges to be separately tried. (*People v. Catlin*, *supra*, 26 Cal.4th at p. 110.) Refusal to sever may be an abuse of discretion where: (1) evidence of the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. (*Ibid.*) If evidence on each of the joined crimes would

*(footnote continued from previous page)*

to rejection of any constitutional theory or " 'gloss' " raised for the first time here. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

have been admissible in a separate trial of the other crimes, then such cross-admissibility ordinarily dispels any inference of prejudice. (*Ibid.*)

As to the first factor, one very significant piece of evidence was cross-admissible. A live nine-millimeter round found in the getaway van used in the Hillgrove Market robbery murder showed the same magazine markings as the expended shells found at the scene of the Skyles and Price murders. This evidence showed that the same gun, and thus inferentially its bearer, was present at both of the murders.[9] As to the second factor, defendants contend the murders of Skyles and Price were particularly inflammatory because the killings had racial overtones. The evidence at trial, however, indicated that Skyles and Price were targeted because they fit the profile of members of a rival gang that is predominantly African-American; no evidence was presented they were killed because of racial animus per se. Both sets of murders were reprehensible and senseless in their own ways — the shooting of an elderly neighborhood grocer during the course of a robbery and the shooting of two teenagers as retaliation for a gang murder to which they apparently had no connection. Neither crime, however, was significantly more inflammatory than the other.

As to the third factor, each defendant contends the murder count in which the prosecutor theorized him to be the aider and abettor was a "weak" case. Thus, Soliz contends the evidence against him as an aider and abettor in the Hillgrove Market robbery murder was weak, and Gonzales argues the evidence against him

---

[9]     The prosecutor's theory on the guns was the following: During the Hillgrove robbery, Gonzales was armed with a .38 special or a .357 magnum revolver and Soliz was armed with a nine-millimeter semiautomatic pistol, although he did not fire it there. Gonzales shot Lester Eaton with the revolver, and Soliz later shot Skyles and Price with the nine-millimeter pistol.

as an aider and abettor in the Skyles and Price murders was weak. But the strength of the evidence supporting each set of murders was similar. In the Hillgrove Market murder, Dorine Ramos testified she saw both defendants preparing for the robbery, and she identified the getaway van they used. Betty Eaton testified two men robbed the market about 7:30 p.m. and one of them killed her husband. Richard Alvarez testified he received a call from Gonzales on the evening of the murder and picked up both defendants near the market between 7:00 and 8:00 p.m. In his taped conversation with Salvador Berber, Gonzales admitted that defendants committed the robbery murder and that he, Gonzales, had been the shooter. Physical evidence linked the van to the Hillgrove Market robbery murder, and Gonzales's fingerprint was found in the van.

In the Skyles and Price murders, Judith Mejorado, a passenger in the car in which defendants rode to the gas station, testified that both defendants got out of the car and confronted the victims, and that Soliz was the shooter. Carol Mateo, who was driving by the gas station at the time of the shooting, and Alejandro Garcia, the clerk on duty at the gas station, testified they saw two men standing outside of the car and identified Soliz as the shooter. In his taped conversation with Berber, Gonzales admitted he and Soliz were at the gas station, although, contrary to the prosecutor's theory of the case, Gonzales claimed sole responsibility for the killings and denied Soliz was involved. As mentioned, a live round found in the getaway van used in the Hillgrove Market robbery murder showed the same magazine markings as the expended shells found at the scene of the Skyles and Price murders, thus providing a physical evidentiary link between the two sets of murders.

As to the fourth and final factor, as defendants acknowledge, both sets of murders were capital counts (the Hillgrove Market murder as involving a robbery murder special circumstance, and the Skyles and Price murders as involving a

29

multiple-murder special circumstance). Either set of murder counts would have exposed defendants to the death penalty even had the counts been severed. Examining the four factors, therefore, we conclude the trial court did not abuse its discretion in denying the severance motions, and the joinder of counts did not result in gross unfairness depriving defendants of due process of law. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 851.)

### 2. *Denial of Motion to Suppress Gonzales's Taped Statements*

As recounted above, fellow inmate and gang member Salvador Berber wore a wire, which recorded his conversation with Gonzales while the two were being transported in a sheriff's van. At the time he was tape-recorded, Gonzales was serving time at the Los Angeles County jail for felony possession of methamphetamine, having pleaded guilty to that offense. He had not yet been charged with either the Eaton murder or the Skyles and Price murders. In the taped conversation, Gonzales admitted his participation in both sets of murders. Gonzales contends the trial court erred in denying his motion under section 1538.5 to suppress his taped statements to Berber on the grounds he (1) was subjected to custodial interrogation by Berber without being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436, and (2) was questioned in the absence of counsel in violation of *Massiah v. United States* (1964) 377 U.S. 201. For the reasons discussed below, we reject both contentions.

In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply the rule to the facts in order to determine whether the law as applied has been violated. (*People v. Hoyos* (2007) 41 Cal.4th 872, 891.) We review the trial court's resolution of the factual inquiry under the deferential substantial evidence standard. (*Ibid.*) Selection of the applicable law is a mixed question of law and fact that is subject to independent review. (*Ibid.*)

30

Gonzales renews on appeal the arguments he made in his suppression motion, which are based on undisputed facts. First, he contends Berber was acting as an agent for law enforcement and therefore was required to inform Gonzales of his *Miranda* rights (see *Miranda v. Arizona*, *supra*, 384 U.S. at pp. 471-474) before eliciting incriminating statements from him. Assuming for the sake of argument that Berber was acting as an agent for law enforcement, we note the United States Supreme Court has rejected " 'the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent.' " (*People v. Webb* (1993) 6 Cal.4th 494, 526, quoting *Illinois v. Perkins* (1990) 496 U.S. 292, 297.) As the high court has explained, "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Illinois v. Perkins*, at p. 297.) Although Gonzales misplaced his trust in confiding in Berber, his tape-recorded statements were voluntary and free of compulsion. Consequently no *Miranda* warnings were required. (*Webb*, at p. 526.)

Second, Gonzales argues he was questioned in counsel's absence in violation of *Massiah v. United States*, *supra*, 377 U.S. 201. But at the time Gonzales spoke with Berber, he had not yet been charged with either the Eaton murder or the Skyles and Price murders, and thus no counsel had been appointed. Even assuming Gonzales was still represented by counsel in the methamphetamine case, in which he had already pleaded guilty and begun to serve a sentence, his *Massiah* argument still fails: The Sixth Amendment right to counsel is offense-specific. (*People v. Carter* (2003) 30 Cal.4th 1166, 1210.)

Alternatively, Gonzales argues that rule 2-100 of the California Rules of Professional Conduct prohibits a lawyer from communicating with another party in a case without the consent of the other party's lawyer, and the prosecutor

31

violated this rule by having his agent Berber communicate with Gonzales. We have, however, previously rejected the argument that rule 2-100 applies to this situation. (*People v. Maury* (2003) 30 Cal.4th 342, 408-409 [addressing Cal. Rules Prof. Conduct, former rule 7-103].)

### 3. *Denial of* Keenan *Counsel*

Gonzales's trial counsel moved for the appointment of a second attorney pursuant to section 987, subdivision (d) and *Keenan v. Superior Court* (1982) 31 Cal.3d 424. Counsel supported the motion with the following declaration: "I am representing JOHN GONZALES in the above numbered case and it has become evident after the preliminary hearing that there are both serious issues for the guilt and penalty phases of this trial. It is therefore necessary for the court to allocate funds to cover the cost of a second attorney to handle different parts of both phases of this trial." The judge assigned to handle section 987.9 motions denied the motion, stating, "The application fails to provide any specific or compelling reasons requiring the assistance of additional counsel." Gonzales contends the trial court's denial of the motion was an abuse of discretion. As we explain, the trial court did not abuse its discretion.

Section 987, subdivision (d) provides in relevant part: "In a capital case, the court may appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed. The request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed." As Gonzales acknowledges, a defendant is entitled to the appointment of a second attorney only if he or she can present "specific, compelling reasons" for the appointment. (*Keenan v. Superior Court*, *supra*, 31 Cal.3d at p. 429, citing *People v. Jackson* (1980) 28 Cal.3d 264, 288.) As Gonzales further acknowledges, we upheld the denial of a similar application in

32

*People v. Staten* (2000) 24 Cal.4th 434, 446-448.  Our explanation there also applies here:  "No abuse of discretion appears.  Defendant's application, consisting of little more than a bare assertion that second counsel was necessary, did not give rise to a presumption that a second attorney was required; he presented no specific, compelling reasons for such appointment."  (*Id*. at p. 447.)

### 4.  Denial of Funds for a Second Investigator

Gonzales's trial counsel filed a confidential motion under section 987.9 for the appointment of a penalty phase investigator.  He requested the appointment of Joel A. Sickler and authorization for $5,000 to pay for his services at a rate of $50 per hour.  Counsel declared that Gonzales was indigent, that he was charged with three counts of murder in a capital case, that the investigative files provided to the defense by the prosecution were voluminous, and that the funds requested were "reasonably necessary for the preparation and presentation of the defense in this case."  The trial court denied the motion in a written order, stating:  "The motion for defense expert examination has been read, considered and denied.  The Court has already appointed one investigator in the case at the standard rate of $25 per hour.  There is no good cause why a second investigator should be appointed at twice the authorized rate or why the current investigator cannot perform the necessary work."  Gonzales contends the trial court abused its discretion in denying him funds to appoint a second investigator.  As we conclude below, the trial court did not abuse its discretion.

Section 987.9, subdivision (a) provides in relevant part:  "In the trial of a capital case . . . the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. . . .  Upon receipt of an application, a judge of the court, other than the trial judge presiding over the case

33

in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to the defendant's attorney." The defendant has the burden of demonstrating the need for the requested services. (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1085.) Although the trial court should view a motion for assistance with considerable liberality, it should order the requested services only upon a showing they are reasonably necessary. On appeal, a trial court's order on a motion for ancillary services is reviewed for abuse of discretion. (*Ibid*.)

Gonzales contends the trial court's refusal to appoint a second investigator "resulted in an imbalance between the prosecution and the defense" because the prosecutor had four investigators and he had only one.[10] Counsel did not explain in connection with his motion, however, and defendant still does not explain on appeal, why the investigator already appointed could not provide any necessary assistance or how additional resources might have changed his penalty phase defense. As a result, defendant failed to carry his burden to show that additional funding was reasonably necessary, and the trial court properly exercised its discretion to deny the motion. (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1085.)

### 5. Asserted Tainting of Jury Panel

In describing the case to a panel of prospective jurors, the trial judge mistakenly mentioned a special circumstance allegation of intentional killing because of race within the meaning of section 190.2, subdivision (a)(16), which

---

**10** In so arguing, Gonzales attempts to draw an analogy between his case and *Ake v. Oklahoma* (1985) 470 U.S. 68, in which the high court held the state must pay for a defense psychiatric expert in certain cases where the defendant's mental condition is likely to be a significant factor at trial. (See *id.* at pp. 82-84.) We do not find the analogy apt. While the due process clause (U.S. Const., 14th Amend.) guarantees a defendant "a fair opportunity to present his defense" (*Ake*, at p. 76), defendant has not shown that one investigator was insufficient for this purpose.

had been included in the original information but was subsequently stricken in pretrial proceedings. Soliz, joined by Gonzales, contends (1) that the trial court erred in denying a defense motion to dismiss the entire panel predicated on the remark, and (2) that evidence of gang motivation for the murders of Skyles and Price later presented at trial aggravated the prejudicial effect of the remark, resulting in a violation of defendants' constitutional rights. As explained below, we conclude the trial court's remarks did not constitute reversible error.

Soliz contends the trial court's erroneous reference to a racial motivation for the killings infected the trial with unfairness, making the resulting conviction a denial of due process. (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643.) We do not see the trial court's remarks as rising to this level. Soliz does not deny that about a week later, when the first panel of prospective jurors returned to the courtroom after submitting their questionnaires, the trial court correctly summarized the charges and allegations without mentioning the former allegations of racial motivation. Soliz contends, however, that the prejudicial effect of the trial court's remark was aggravated by the prosecutor's later presentation at trial of evidence that the killing of Skyles and Price was gang related. As recounted, the prosecution's expert witness on gangs, Detective Lusk, testified that the murders of Skyles and Price were probably gang retaliation killings motivated by the earlier killing of Billy Gallegos, a member of the Hispanic Puente gang, by members of the Neighborhood Crips, an African-American gang. Lusk testified that victims of gang retaliation shootings are targeted for being within the general area of the rival gang, for being a certain race, and for wearing a certain style of clothing.

Defendant cites *Dawson v. Delaware* (1992) 503 U.S. 159, 165, for the proposition that to allow evidence of racism that has no relevance to the proceedings in a capital case is federal constitutional error. In *Dawson*, the high

35

court held that the defendant's constitutional rights were violated when, at the penalty phase of his capital trial, the prosecutor introduced a stipulation that the defendant belonged to the Aryan Brotherhood prison gang. The court held this evidence was not relevant to prove any aggravating circumstance and proved nothing more than the defendant's abstract beliefs.[11] (*Dawson*, at pp. 166-167.) In the case before us, Soliz contends Lusk's testimony was evidence that Skyles and Price were intentionally killed because of their race, despite the striking of the race-motivation special-circumstance allegation. Lusk, however, did not state that Skyles and Price were killed because of their race. Rather, his testimony was that they might have been targeted because they fit the profile of a rival gang member, one element of which was being African-American.[12] The evidence presented at defendants' trial was therefore distinguishable from the irrelevant evidence of racial prejudice criticized by the high court in *Dawson*. We therefore reject defendants' contention that the trial court's mistaken reference to the stricken special circumstance so infected their trial with unfairness that it denied them due process of law. The trial court's reference was brief, was subsequently corrected, and was not aggravated by later events at trial.

---

[11] As the high court noted, both the defendant and his victim were White. (*Dawson v. Delaware*, *supra*, 503 U.S. at p. 166.)

[12] Soliz further contends the prosecutor stated in closing argument that Skyles and Price were killed because they were African-American, but this was only one of the factors in the gang-member profile he referred to: "Mr. Skyles and Mr. Price happened to be Black. They happened to be out at the wrong time of night. They happened to be in the wrong location. And they probably happened to be wearing the wrong kind of clothes."

### 6. *Asserted Lack of Jurisdiction for First Degree Murder*

Soliz, joined by Gonzales, contends the trial court lacked jurisdiction to try defendants for first degree murder because the information cited only section 187, subdivision (a), which encompasses only second degree malice murder. We have previously rejected this argument, as Soliz acknowledges, and we decline his invitation to revisit our prior holdings. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 222; *People v. Hughes* (2002) 27 Cal.4th 287, 368-370.)

### B. Guilt Phase Issues

### 1. *Wrongfully Admitted Evidence of Threats Against Witnesses*

Judith Mejorado had been present at the gas station during the murders of Skyles and Price. In his testimony about his interview with her, Deputy Sheriff David Castillo testified that after the interview Judith had expressed concerns about her brother. When the prosecutor asked Castillo about the basis for Judith's concern, counsel for Gonzales objected on the grounds of relevance. The court ruled that the question pertained to the circumstances of the witness's statement and overruled the objection, whereupon Castillo testified that Judith had said she was concerned for her brother's safety from the people involved in the incident.

Salvador Berber had worn a wire and recorded his conversation with Gonzales while the two were being transported in a sheriff's van. Berber entered into a plea bargain that required him to testify in defendants' case. When the prosecutor asked Berber whether, as part of his plea agreement, he had been relocated out of Los Angeles County, counsel for Gonzales objected on the grounds of relevance. The trial court overruled the objection, stating that the relocation was part of the plea agreement and the jury should appropriately know all of the agreement's circumstances.

Soliz, joined by Gonzales, contends the trial court erred in admitting, over defense objections, the foregoing statements by Judith and Berber. Defendants

base their claim of error on cases in which threats to witnesses were admitted as evidence of a defendant's consciousness of guilt. As we have stated, "evidence that a defendant is threatening witnesses implies a consciousness of guilt and thus is highly prejudicial and admissible only if adequately substantiated . . . ." (*People v. Warren* (1988) 45 Cal.3d 471, 481.) Defendants contend that because no evidence here substantiated the supposed threats, the statements should have been excluded.

We disagree with defendants' premise that the statements are properly characterized as reporting threats. The statements do not repeat threats made by defendants towards Judith and Berber; at most, they suggest the two witnesses were afraid of defendants. As we have stated, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) "An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court." (*Ibid.*) Here, Judith's concern for her brother was part of the circumstances in which she made her statements, which in turn were relevant to her credibility and helped explain her initial reluctance to discuss the shootings with the investigating officers. Likewise, the circumstances of Berber's plea agreement were relevant to his credibility as a prosecution witness and, as the trial court stated in overruling the defense objection, the jury was entitled to know them. If the circumstances of his plea agreement also revealed Berber's fear of defendants, then, as we stated in *Burgener*, at page 869, the circumstances were also admissible as evidence bearing on Berber's credibility. The trial court did not err in overruling the relevance objections and admitting the statements.

## 2. *Exclusion of Prosecution Expert Witness as Expert Witness for the Defense*

Detective Scott Lusk, a homicide detective from the Los Angeles County Sheriff's Department, testified as an expert witness for the prosecution concerning the Puente gang. Trial counsel for Soliz asked permission to call Lusk as his own witness and question him as an expert in photographic lineups on the issue of whether the photographic six-pack lineups had been properly prepared. The trial court denied the request as invading the province of the jury. The trial court stated that counsel could argue the point that the lineups were improperly prepared, but could not ask Lusk to express his opinion as to whether they were unduly suggestive.

Later, during the defense case, counsel for Soliz questioned Sergeant Holmes, the officer who prepared the photographic lineup of Soliz. Sergeant Holmes testified that in preparing it, he chose photographs of people who had hair like Soliz's. In response to counsel for Soliz's question whether he would agree the photograph of Soliz showed the shortest hair of the six subjects in the lineup, Sergeant Holmes answered "no" and stated that two of the other subjects had the same length hair and the rest had hair slightly longer.

Citing *People v. McDonald* (1984) 37 Cal.3d 351, Soliz, joined by Gonzales, contends the trial court erred in refusing to allow Lusk to be questioned as an expert on the photographic lineups used in the case. In *McDonald*, we reiterated that "in the usual case the appellate court will continue to defer to the trial court's discretion" in excluding expert testimony. (*Id.* at p. 377.) We held, however, that it will ordinarily be error to exclude expert testimony on eyewitness identification when "eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on

39

specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury . . . ." (*Ibid*.)

Initially, we note the record does not establish that Lusk had any particular expertise on the psychological factors involved in eyewitness identification. The only basis Soliz's counsel offered for soliciting Lusk's opinion about photographic lineups was that Lusk was currently a homicide investigator, an assignment he had held for the previous six months out of his 18 years as a sheriff's deputy, and that he had prepared some photographic lineups in that capacity. Lusk had not prepared any of the photographic lineups in defendants' case. As recounted, the officer who had prepared the photographic lineup of Soliz, Sergeant Holmes, was examined by the defense about the procedures he followed.

Even assuming for the sake of argument that Lusk could be considered an expert on eyewitness identification, *McDonald* does not apply when an eyewitness identification is "substantially corroborated by evidence giving it independent reliability." (*People v. McDonald*, *supra*, 37 Cal.3d at p. 377.) Here, Judith Mejorado's identification of Soliz as the shooter constituted substantial, independent corroboration because she personally knew both defendants before the shooting, and her identification of Soliz was therefore not based on the challenged photographic lineup.

### 3. Motions for Continuance and Mistrial Based on the "Struggle for the Gun"

As described, Salvador Berber wore a wire and recorded his conversation with Gonzales while the two were being transported in a sheriff's van. Gonzales in his tape-recorded conversation with Berber claimed sole responsibility for shooting Skyles and Price. During cross-examination, counsel for Soliz asked Berber whether Gonzales had made any gestures or had any expressions on his

40

face when he described how he shot Skyles and Price. Counsel then asked, "at what point was it that [Gonzales] indicated that he had a gun . . . ?" Berber answered: "That was the time in the — you can't hear it on the tape — that he said that him and Jasper [Soliz] were struggling for the gun to, I guess, see who were gonna shoot the black kids."

During a break and outside the presence of the jury, counsel for Soliz moved for a continuance to obtain an expert to analyze the tape or, in the alternative, to strike Berber's answer as unresponsive and to admonish the jury to disregard it. The trial court denied the motion for a continuance but agreed to instruct the jury to disregard Berber's statement about the struggle for the gun. Soliz then moved for a mistrial, which the court denied. Soliz, joined by Gonzales, contends the trial court erred in denying the continuance and the motion for a mistrial.

Granting or denying a motion for midtrial continuance is within the sound discretion of the trial court, which must consider not only the benefit the moving party anticipates, but also the likelihood the benefit will result. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1105-1106.) The trial court here did not abuse its discretion in denying the motion; it made the reasonable assessment that because of the loud road noise on parts of the tape no further conversation would be recovered through audio enhancement. In any event, the trial court struck Berber's statement and admonished the jury to disregard it, which eliminated any prejudice to Soliz.

As to Soliz's motion for mistrial, we have stated that a trial court should grant a mistrial only if the defendant will suffer prejudice that is incurable by admonition or instruction. (*People v. Davis* (2005) 36 Cal.4th 510, 553-554.) A trial court has considerable discretion in its assessment of incurable prejudice. (*Id.* at p. 554.) Here, the trial court struck Berber's testimony and properly

41

admonished the jury. Although Soliz asserts the admonitions were inadequate, we see no basis for the assertion and presume, as always, that the jury followed the court's instructions. (*People v. Panah* (2005) 35 Cal.4th 395, 453.) We therefore conclude the trial court did not err in denying Soliz's motion for mistrial.

### 4. *Restriction on Cross-examination of Gang Expert*

On direct examination, Detective Lusk, the prosecution's gang expert, testified that a gang member will sometimes brag to another gang member and take credit for a crime he did not commit. Lusk gave the following explanation: "It goes back to respect or fear or one's ranking within the gang. The fact that you're there and maybe you're talking to somebody who was not there. It's like embellishing. You know, I was there; well, take credit for the shooting also. And your ranking will move up within the gang." Lusk's testimony on this point therefore helped support the prosecution theory that Soliz shot Skyles and Price despite the fact Gonzales claimed sole responsibility in his taped conversation with Salvador Berber. In an attempt to undermine Lusk's testimony, counsel for Soliz sought to question Lusk on the significance of the purported fact that Soliz in his recorded jailhouse conversations never took credit for any of the shootings. The prosecutor objected to this line of questioning, and the trial court sustained the objection. Soliz, joined by Gonzales, now contends the trial court improperly restricted Soliz's cross-examination of Lusk and thereby violated his constitutional right to present a defense. As we conclude below, the trial court did not err in excluding this line of questioning.

The line of questioning Soliz's counsel proposed raised both an admissibility and a relevance issue. The prosecutor had introduced several tape-recorded jailhouse conversations of defendants, including one between Soliz and his fiancée, Luz Jauregui. Counsel, however, was proposing to question Lusk

42

about *all* of Soliz's recorded jailhouse conversations, not just those the prosecutor had introduced. Because Soliz's recorded jailhouse conversations were admissible under Evidence Code section 1220 only "when offered against the declarant," that is, when offered by another party (Evid. Code, § 1220), counsel needed to articulate a theory of admissibility for those tapes not already introduced by the prosecutor. But neither at trial nor on appeal has Soliz done so. Rather, Soliz now frames the issue as whether the trial court improperly limited questioning on the tape that had already been admitted into evidence, namely, Soliz's conversation with Luz Jauregui. In his conversation with Jauregui, Soliz referred to a newspaper article on the Hillgrove Market robbery murder and stated: "It says . . . they got two more suspects. They haven't found 'em yet? Damn, they got one of 'em right here. 'But your honor, I'm a changed man.' " Soliz acknowledges his statement implies his involvement in the Hillgrove Market robbery, but contends that he made no admissions about being the shooter in either set of murders. This claim presents the relevance issue. The court afforded Soliz latitude in questioning Lusk about his opinion that gang members sometimes take credit for crimes they did not commit, but properly sustained the prosecutor's relevance objection to questioning that attempted to prove a negative, i.e., that because Soliz never claimed to have shot Skyles and Price, he did not shoot them. The absence of a confession has no bearing on guilt or innocence.

> 5. *Sufficiency of the Evidence of First Degree Murder for the Killings of Skyles and Price*

Both defendants were convicted of the first degree murders of Skyles and Price. The prosecution's theory was that Soliz was the actual shooter and Gonzales an aider and abettor. Defendants contend that, even assuming Soliz shot Skyles and Price, the evidence does not support Soliz's conviction for first degree murder under a theory of deliberate and premeditated murder, which was the only

43

applicable theory of first degree murder. Gonzales separately contends that, assuming the evidence supported Soliz's conviction for first degree murder, the evidence was insufficient to support Gonzales's conviction as an aider and abettor. As we conclude below, the evidence presented at trial supported both convictions.

As noted, Judith Mejorado told police she was in the car with defendants when they drove by the gas station where Skyles and Price were standing. Defendants said they knew Skyles and Price and asked the driver to go back to the station so they could talk to them. Defendants got out of the car and approached them, with Gonzales staying closer to the car than Soliz. Gonzales had a gun in his possession, although he did not fire it. Judith heard both defendants arguing with Skyles and Price. She heard Skyles or Price say, "No. I didn't mean to do you that way. I'm sorry. I didn't mean to do you that way." Soliz responded with some statements and then shot Skyles and Price. When defendants reentered the car after the shooting, they told her: "You didn't see nothing. You don't know nothing."

Detective Lusk testified defendants were members of the Puente gang. In Lusk's opinion, the murders of Skyles and Price were probably a gang retaliation killing motivated by the earlier killing by Crips gang members of Billy Gallegos, a Puente gang member. Skyles and Price were wearing what looked like gang clothing and, in Lusk's opinion, could have been targeted even if they did not in fact belong to a gang. Lusk testified that when a gang member stands "backup" for another gang member, this serves several purposes for the gang, e.g., to provide additional force in case the victim resists, or to encourage the first gang member to proceed with the shooting.

The law we apply in assessing a claim of sufficiency of the evidence is well established: " ' " '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial

44

evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419.)  The standard is the same under the state and federal due process clauses.  (*People v. Berryman* (1993) 6 Cal.4th 1048, 1082-1083.)  "We presume ' "in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]  This standard applies whether direct or circumstantial evidence is involved.'  [Citations.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1251.)

### a.  Premeditated and Deliberate Murder

Defendants contend the evidence was insufficient to support Soliz's conviction for premeditated and deliberate murder because the evidence did not support the so-called *Anderson* factors, which are three types of evidence commonly present in cases of premeditated and deliberate murder.  The *Anderson* factors are evidence of (1) planning activity, (2) preexisting motive and (3) manner of killing.  (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)  While we address defendants' arguments based on the *Anderson* factors below, we reiterate that "[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate." (*People v. Thomas* (1992) 2 Cal.4th 489, 517.)  "The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.  It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*Ibid.*)

Defendants contend no evidence of prior planning existed as to the murder of Skyles and Price because defendants were apparently on their way home from a

party when they saw the victims and decided to confront them. Premeditation and deliberation, however, can occur in a brief interval: " ' "[t]he test is not time, but reflection," ' " as " ' " '[t]houghts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Osband* (1996) 13 Cal.4th 622, 697.) Here, the evidence of motive was that defendants targeted Skyles and Price for a gang retaliation murder because of the prior murder of Puente gang member Billy Gallegos by Crips gang members. This motive evidence supported the inference that defendants, who were armed at the time, had the prospect of retaliation in mind and quickly decided to commit the murders once they identified potential targets. A reasonable inference, therefore, is that defendants formed the intent to commit premeditated and deliberate murder as early as when they asked the driver to turn the car around and return to the gas station to confront Skyles and Price, who fit the profile of retaliatory targets, whether or not they actually belonged to the Crips gang.

Defendants contend the nature of the killings — multiple gunshots at close range with a semiautomatic weapon — and the fact defendants were arguing with the victims just before the shootings, suggest the killings were the result of an unconsidered or rash impulse, which might indicate a mental state less than that required for premeditated and deliberate murder. No evidence was presented, however, of provocation that could have reduced the murders to voluntary manslaughter. The manner of killing — a close-range shooting without any provocation or evidence of a struggle — additionally supports an inference of premeditation and deliberation. (*People v. Marks* (2003) 31 Cal.4th 197, 230.) Finally, assuming a reasonable jury could have found the evidence did not support premeditation and deliberation and returned a verdict of second degree murder, defendants' convictions must stand because, as we have stated, "[i]f the circumstances reasonably justify the jury's findings, the reviewing court may not

reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

### b. *Gonzales as Aider and Abettor*

On appeal, Gonzales renews his trial counsel's closing arguments that Gonzales did nothing to aid and abet the shooting of Skyles and Price. Gonzales contends his mere presence at the scene of the crime and association with Soliz, who committed the crime, are insufficient to establish aiding and abetting. As we discuss below, however, evidence at trial established Gonzales knew and shared Soliz's intent to murder Skyles and Price or, alternatively, knew and shared Soliz's intent to assault Skyles and Price with a deadly weapon, the natural and probable consequence of which was their murder. Under either theory, Gonzales acted to encourage the shootings by providing armed backup to Soliz.

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Furthermore, under the "natural and probable consequences" doctrine, an aider and abettor is guilty not only of the offense he or she intended to facilitate or encourage, but also any reasonably foreseeable offense committed by the person he or she aids and abets. (*People v. Prettyman* (1996) 14 Cal.4th 248, 261.)

As noted, both defendants urged the driver to turn the car around and drive back to the gas station so they could confront Skyles and Price, and both defendants exited the car. Because Gonzales had previously committed an armed robbery with Soliz at the Hillgrove Market, a jury reasonably could infer Gonzales knew Soliz was armed and capable of using deadly force. That Gonzales himself

47

was carrying a firearm further strengthens the inference. A jury could reasonably conclude Gonzales knew of and shared Soliz's intention to murder Skyles and Price or, at the least, knew Soliz intended to assault them with a deadly weapon and shared that intention, which in turn establishes Gonzales's liability as an aider and abettor to the murder under the natural and probable consequences doctrine. That Gonzales and Soliz both argued with Skyles and Price further demonstrated Gonzales's shared intention and active participation in the confrontation. Because Gonzales was armed, his act of standing backup aided and encouraged Soliz in shooting Skyles and Price by providing further deadly force in case the victims resisted. Furthermore, based on Lusk's testimony about how gang members encourage each other to commit acts of gang violence by standing backup, a jury reasonably could have inferred that Gonzales's armed presence encouraged Soliz to go through with an act of gang retaliation, which was the motive supported by the evidence of the prior murder of Puente gang member Billy Gallegos. Finally, after the shootings, both defendants warned Judith Mejorado to forget what she had just witnessed, which displayed a consciousness of shared guilt.

Gonzales cites a Ninth Circuit Court of Appeals decision, *Juan H. v. Allen* (9th Cir. 2005) 408 F.3d 1262, in support of his contention that the evidence presented was insufficient to support his conviction for first degree murder as an aider and abettor. We initially note that while we may find lower federal court decisions on points of state law persuasive, they do not control. (*People v. Avena* (1996) 13 Cal.4th 394, 431.) In any event, the facts of *Juan H.* are distinguishable. In *Juan H.*, the defendant, a juvenile, was at home with his family when someone fired two shots into the trailer in which he lived. (*Juan H.*, at p. 1266.) An hour and a half later, the defendant and his brother confronted two men with whom they had a history of conflict at the trailer park, and who were associated with a rival gang. (*Id*. at pp. 1266-1267.) The defendant's brother

48

asked the two men whether they had fired the shots, and the men replied they knew nothing about the incident. (*Id.* at p. 1267.) The defendant's brother then pulled out a shotgun and fired at both men, killing one of them. (*Ibid.*)

The Ninth Circuit granted Juan H.'s federal petition for writ of habeas corpus, ruling that the record contained insufficient evidence to support the conclusions that Juan H. knew his brother planned to commit the first degree murders or that Juan H. acted in a way intended to encourage or facilitate the killings. (*Juan H. v. Allen*, *supra*, 408 F.3d at p. 1277.) The court further held that, even assuming the element of knowledge, the record contained no evidence that Juan H. did or said anything before, during or after the shooting from which a reasonable fact finder would infer a purpose to aid and abet in the murders. (*Id.* at pp. 1278-1279.) Specifically, the court held no reasonable fact finder could conclude that by standing, unarmed, behind his brother, Juan H. provided "backup," in the sense of adding deadly force or protecting his brother, in a deadly exchange. (*Id.* at p. 1279.)

Significant differences exist between the evidence presented in *Juan H. v. Allen*, *supra*, 408 F.3d 1262, and that presented in the case before us. Unlike Juan H., Gonzales did and said things both before and after the shooting that indicated his intent to aid and abet the murders. Gonzales joined with Soliz in (1) asking the driver to turn the car around so they could confront Skyles and Price, (2) arguing with Skyles and Price, and (3) warning Judith Mejorado to forget what she had just witnessed. Finally, Gonzales was armed, further supporting the inference he provided backup by adding deadly force support to Soliz. We therefore reject Gonzales's claim that the evidence was insufficient to establish his aiding and abetting the murders.

### 6. *Jury Instruction on the Natural and Probable Consequences Doctrine*

The trial court instructed the jury with CALJIC No. 3.02 on the liability of an aider and abettor for any other crime committed by the principal that is a natural and probable consequence of the crime originally aided and abetted, and specified the target crime as assault. Gonzales contends the trial court erred in specifying the target crime as assault rather than assault with a deadly weapon, because simple assault cannot as a matter of law support liability for murder under the natural and probable consequences doctrine. As we conclude below, the trial court did not err.

In his summation, the prosecutor argued that Soliz shot Skyles and Price and that Gonzales aided and abetted the shooting. The prosecutor argued Gonzales directly shared Soliz's intention to kill Skyles and Price when Gonzales, who was also armed, exited the car along with Soliz to confront Skyles and Price. While he was explaining the concept of aiding and abetting to the jury, the prosecutor also mentioned the natural and probable consequences doctrine, which he described as follows: "[I]f you go out to help somebody commit a crime and you're thinking of a specific crime . . . and you do some act to help that person and you intend to help that person, you know the person is going to commit the crime, you're guilty for not only that specific crime that you have in your head, you're guilty for any other crime that's reasonably foreseeable under the circumstances that that other person might commit." The prosecutor gave as an example armed robbery, because murder is a foreseeable crime for which an aider and abettor to an armed robbery could be liable.

Following closing arguments, the trial court gave CALJIC No. 3.02 (1997 rev.): "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal

50

which is a natural and probable consequence of the crime originally aided and abetted.  [¶] Therefore, you may find the defendant guilty of the crime of murder as charged in Counts 4 and 5, even if he did not intend to commit murder, if you are satisfied beyond a reasonable doubt that:  [¶] 1. The crime of assault was committed;  [¶] 2. That the defendant aided and abetted that crime;  [¶] 3. That a co-principal in that crime committed the crime of murder; and  [¶] 4. The crime of murder was a natural and probable consequence of the commission of the crime of assault.  [¶] The crime of assault is defined elsewhere in these instructions."  The court defined assault (CALJIC No. 9.00) and instructed that assault requires a present ability to commit injury (CALJIC No. 9.01).

Relying on *People v. Prettyman*, *supra*, 14 Cal.4th 248, Gonzales contends that, as matter of law, murder is not a natural and probable consequence of simple assault unless the assault is committed with a deadly weapon or by means of force likely to produce great bodily injury.  In *Prettyman*, we summarized the natural and probable consequences doctrine as follows:  "Under California law, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted.  To convict a defendant of a nontarget crime as an accomplice under the 'natural and probable consequences' doctrine, the jury must find that, with knowledge of the perpetrator's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime, the defendant aided, promoted, encouraged, or instigated the commission of the target crime.  The jury must also find that the defendant's confederate committed an offense other than the target crime, and that the nontarget offense perpetrated by the confederate was a 'natural and probable

51

consequence' of the target crime that the defendant assisted or encouraged." (*Id.* at p. 254.)

Prettyman addressed a conflict in the case law concerning whether a trial court was required to identify and define the target offense for the jury or need only describe the target offense generally as some criminal or nefarious conduct intended by the defendant. (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 266.) We agreed with the line of cases adopting the first of these two alternatives and held that, "when the prosecutor relies on the 'natural and probable consequences' doctrine, the trial court must identify and describe the target crimes that the defendant might have assisted or encouraged." (*Id*. at p. 254.) We reasoned: "An instruction *identifying* target crimes will assist the jury in determining whether the crime charged was a natural and probable consequence of some other criminal act. And an instruction *describing* the target crimes will eliminate the risk that the jury will engage in uninformed speculation with regard to what types of conduct are criminal." (*Ibid.*)

While *Prettyman* explains when a trial court must identify and describe the target crimes for the natural and probable consequences doctrine, the decision does not directly address what crimes can or cannot provide liability for murder under the doctrine. In that case, the prosecutor's theory was that one of the defendants, Bray, had encouraged the other defendant, Prettyman, to kill the victim with a metal pipe. (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 255.) The trial court instructed the jury with the natural and probable consequences doctrine but failed to specify the target crime. We observed that "instructions identifying and describing the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245) as the appropriate target crime would have assisted the jury in determining whether Bray was guilty of [the victim]'s murder under the 'natural and probable consequences' doctrine." (*Id*. at p. 267.) In

52

describing the target crime there as a form of aggravated assault, we did not hold that *only* aggravated assault can provide a predicate for murder under the natural and probable consequences doctrine.  To be sure, we cautioned that a conviction for murder under the natural and probable consequences doctrine could not be based on " 'trivial' " activities (*id*. at p. 269), but nowhere did we suggest that simple assault must be considered trivial for these purposes.

Additional authority cited by Gonzales likewise fails to support the proposition that simple assault cannot serve as the target offense.  In *People v. Gonzales* (2001) 87 Cal.App.4th 1, the defendant was convicted of murder under the natural and probable consequences doctrine.  (*Id*. at p. 5.)  The evidence indicated the defendant had aided and abetted a group of men to fight another group, during the course of which a member of the defendant's group, Jimenez, had shot and killed Llamas, one of the men in the other group.  (*Id*. at pp. 7-8.)  The trial court identified the target crime as "assault" but did not instruct on the elements of the crime.  (*Id*. at pp. 10-11 & fn. 1.)  On appeal, the defendant argued the trial court had a sua sponte duty to instruct that a finding of guilt based on the natural and probable consequences doctrine must depend on his knowing that the shooter, Jimenez, was armed.  (*Id*. at p. 5.)  In effect, the defendant contended his liability for murder under the natural and probable consequences doctrine had to be based on his intent to aid and abet an assault with a deadly weapon.  The Court of Appeal rejected the contention, concluding:  "The standard instructions given were sufficient to facilitate the jury's determination that under these circumstances, Llamas's murder was a natural and probable consequence of the assault." (*Id*. at p. 11.)  We likewise reject Gonzales's contention here that, as a

matter of law, simple assault cannot serve as the target offense for murder liability under the natural and probable consequences doctrine.[13]

Gonzales argues in the alternative that the court, by identifying the target crime as simple assault, in effect allowed the jury to base its verdict on a noncriminal act. The legal basis for the argument is our statement in *People v. Prettyman*, *supra*, 14 Cal.4th at page 254, that the reason why a trial court must describe the target offense is to "eliminate the risk that the jury will engage in uninformed speculation with regard to what types of conduct are criminal." In this case, however, the argument lacks any factual basis. The evidence supports only the single scenario that Soliz assaulted Skyles and Price with his gun. Although the trial court might properly have identified and described the target crime more specifically as assault with a deadly weapon, its instruction with a general definition of assault encompassed the circumstances of the assault described by the evidence and thus satisfied the requirements of *Prettyman*.

### 7. No Sua Sponte Instruction on Voluntary Manslaughter

Defendants contend that, as to the murders of Skyles and Price, the trial court erred in failing to instruct the jury sua sponte on the lesser included offense of voluntary manslaughter based upon a sudden quarrel or heat of passion. As we discuss below, the evidence failed to disclose any provocation by the victims, and the trial court therefore had no duty to instruct on voluntary manslaughter.

Before the shooting Judith Mejorado heard defendants talking loudly with Skyles and Price. She heard one of the victims say, "No, I didn't mean to do you that way. I'm sorry. I didn't mean to do you that way." Defendants contend that

---

[13] See also *People v. Medina* (2009) 46 Cal.4th 913, where neither the majority nor the dissent questioned that simple assault could serve as the target offense.

54

because this sounded like an argument, the evidence was sufficient to submit to the jury the question of whether the killing of Skyles and Price was the result of a sudden quarrel and was therefore manslaughter, not murder. Where there is substantial evidence of a lesser included offense, such as manslaughter, the trial court has a duty to instruct on it. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) We see, however, no substantial evidence of heat of passion or sudden quarrel.

In her testimony at the preliminary hearing, which was read at trial, Judith testified that the interchange between defendants and Skyles and Price "was just like loud talking. It wasn't like — it didn't sound like an argument." Furthermore, even assuming that what she described could be seen as an argument, voluntary manslaughter based upon sudden quarrel or heat of passion requires a showing of adequate provocation, which has both a subjective and an objective component. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) The defendant must actually and subjectively kill under the heat of passion, but the circumstances giving rise to the heat of passion are also viewed objectively to determine whether the " 'circumstances were sufficient to arouse the passion of the ordinarily reasonable man.' " (*Id*. at pp. 1252-1253.) Defendants contend they were provoked because their fellow gang member, Billy Gallegos, had been killed by Crips gang members two weeks earlier and defendants believed Skyles and Price had been involved in the murder. No evidence, however, established that Skyles and Price had been involved in the Gallegos murder. The mere fact Soliz shot them does not establish they were involved or even that they were gang members. As the prosecution gang expert testified, Skyles and Price could have been targeted for a gang retaliation killing because they fit the profile of a rival gang member, not because they necessarily had any involvement in the Gallegos murder. More importantly, a passion for revenge cannot satisfy the objective

requirement for provocation. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.) As we explained long ago, "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." (*People v. Logan* (1917) 175 Cal. 45, 49; see also *Gutierrez*, at pp. 1143-1144.)

### 8. *No Sua Sponte Instruction on Accomplice Testimony for Richard F. Alvarez*

Fellow Puente gang member Richard F. Alvarez testified that he picked up defendants in his car from a location close to the Hillgrove Market on the night of the robbery murder. Gonzales, joined by Soliz, contends the trial court erred by failing to give, sua sponte, jury instructions on accomplice testimony for Alvarez. As explained below, we conclude the trial court did not err, or assuming it did, the error was harmless because Alvarez's testimony was sufficiently corroborated by other evidence.

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." Under section 1111, an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." An accomplice must have " 'guilty knowledge and intent with regard to the commission of the crime.' " (*People v. Hoover* (1974) 12 Cal.3d 875, 879, quoting *People v. Duncan* (1960) 53 Cal.2d 803, 816.) "If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony. [Citation.] But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that

56

determination and, in that situation, need not instruct the jury on accomplice testimony." (*People v. Horton* (1995) 11 Cal.4th 1068, 1114.)  Here, the trial court made no determination that Alvarez was not an accomplice as a matter of law, nor did the court give the accomplice instructions.  Defendants contend the evidence was sufficient to submit the accomplice issue to the jury, and consequently the jury should have been instructed, inter alia, with CALJIC Nos. 3.10 (defining accomplice), 3.12 (sufficiency of the evidence of corroboration), and 3.18 (accomplice's testimony to be viewed with distrust).

As mentioned above, Alvarez testified that he picked up defendants from the vicinity of the Hillgrove Market robbery murder.  Although evidence of his conduct after the commission of the crime might have implicated him as an accessory, his status as such would not subject him to accomplice liability. (*People v. Horton*, *supra*, 11 Cal.4th at p. 1116.)  Additionally, an investigating officer testified that Alvarez told him he had followed defendants to the vicinity of the robbery murder, waited for them, and driven them back after they abandoned the van used in the robbery.  Even if one assumes that Alvarez's statements to the investigating officer reflected his actual role, no direct evidence was presented that Alvarez had knowledge of the robbery and intended to facilitate it.  Whether the evidence met the preponderance of the evidence standard requiring the trial court to submit the accomplice issue to the jury is therefore a close question.  (See *People v. Hernandez* (2003) 30 Cal.4th 835, 874.)  We conclude it did not.

Even assuming, however, the trial court erred by failing to give accomplice instructions for Alvarez, we find the error to be harmless.  "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record." (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)  "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged

offense." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271.) The evidence is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*People v. Fauber* (1992) 2 Cal.4th 792, 834.) Other evidence in the case sufficiently connected defendants with the Hillgrove Market robbery murder, such as the testimony of Dorine Ramos describing defendants' activities in preparation for the robbery, the discovery of Gonzales's fingerprints on the market's paperwork found in the blue van used for the robbery and, most importantly, Gonzales's tape-recorded statements to Salvador Berber, in which he admitted that defendants committed the Hillgrove Market robbery murder.

Gonzales acknowledges Alvarez's testimony was sufficiently corroborated under the standard stated in *People v. Lewis*, *supra*, 26 Cal.4th 334, and prior cases, but he argues we should reconsider the standard. He contends the failure to instruct on the corroboration of accomplice testimony should require the full harmless error analysis for state law error according to *People v. Watson* (1956) 46 Cal.2d 818, 836, which requires reversal if, after an examination of the entire case, "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." In a related argument, Gonzales contends that, even assuming the *Lewis* standard for the corroboration of accomplice evidence is correct and the corroboration in this case rendered harmless the omission of CALJIC No. 3.12 (sufficiency of the evidence of corroboration), it did not render harmless the omission of CALJIC No. 3.18 (accomplice's testimony to be viewed with distrust), which Gonzales contends must be separately examined for harmless error under *Watson.* As we explain below, we reject Gonzales's contentions.

Section 1111 codifies common law concerns about the reliability of accomplice testimony. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 967.) "[S]uch

58

testimony has been legislatively determined never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated." (*Ibid*.) Our analysis of harmless error in the omission of accomplice instructions reflects the idea that sufficient corroboration allays the concerns regarding unreliability embodied in section 1111. Thus, even in cases where the full complement of accomplice instructions (including CALJIC No. 3.18) was erroneously omitted, we have found that sufficient corroborating evidence of the accomplice testimony rendered the omission harmless. (See, e.g., *People v. Arias* (1996) 13 Cal.4th 92, 143; *People v. Zapien* (1993) 4 Cal.4th 929, 982-983.) As discussed, the evidence of corroboration is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*People v. Fauber*, *supra*, 2 Cal.4th at p. 834.) Furthermore, we have held that "even if there were insufficient corroboration, reversal is not required unless it is reasonably probable a result more favorable to the defendant would have been reached." (*People v. Miranda* (1987) 44 Cal.3d 57, 101.) In other words, *in the absence of sufficient corroboration* we will submit the omission of accomplice instructions to the harmless error analysis for state law error under *People v. Watson*, *supra*, 46 Cal.2d at page 836.

To be sure, we have occasionally engaged in both an analysis of the sufficiency of corroboration and an additional harmless error analysis under *People v. Watson*, *supra*, 46 Cal.2d 818, when the full complement of accomplice instructions has been omitted. (See, e.g., *People v. Box* (2000) 23 Cal.4th 1153, 1209; *People v. Lewis*, *supra*, 26 Cal.4th at p. 371; *People v. Hinton* (2006) 37 Cal.4th 839, 881.) One such case is *Lewis*, to which Gonzales points as supporting his contention that a *Watson* analysis is required whenever CALJIC No. 3.18 is omitted. We reject the contention. We view the *Watson* analysis in *Lewis* as an alternative harmless error analysis, based on an assumed alternative argument that

59

the corroboration of the accomplice testimony was insufficient. In *Lewis*, we concluded that witness credibility instructions given in that case, including CALJIC Nos. 2.20 and 2.21.2, were sufficient to instruct the jury to view an asserted accomplice's testimony with care and caution, in line with CALJIC No. 3.18, and that no reasonable probability existed that the defendant would have received a more favorable result if the trial court had instructed the jury with CALJIC No. 3.18. (*Lewis*, at p. 371.) The same conclusion can be drawn in the instant case. CALJIC Nos. 2.20 and 2.21.2 were given in defendants' case. As noted, Alvarez's testimony at trial conflicted with statements he had made to a homicide investigator. The jury therefore would have used the witness credibility instructions it was given in evaluating the truth of his testimony. This provides an additional and alternative basis for our conclusion that any error in the trial court's failure to give the accomplice instructions was harmless.

### 9. *Prosecutorial Misconduct in Closing Argument*

Gonzales contends the prosecutor engaged in misconduct during summation by (1) arguing that the jury should find Gonzales guilty of the Skyles and Price murders because he had committed the Lester Eaton murder; (2) arguing that Gonzales's counsel had conceded Gonzales's guilt as to the Eaton murder during final argument, when in fact no such concession was made; and (3) attacking defense counsel by arguing that defense photographs taken at the Skyles and Price murder scene were deceptive. As we discuss below, we conclude Gonzales mischaracterizes the prosecutor's arguments and that no misconduct occurred.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a

60

criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)  When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.)

### a.  Defendants as "Crimies"

In discussing the Skyles and Price murders, the prosecutor discussed defendants' close criminal partnership:  "First of all, both defendants, Soliz and Gonzales are 'crimies' [*sic*].  And when I say 'crimies,'  I don't simply mean fellow gangsters or home boys in the same gang.  They're that. . . .  But they go beyond being fellow gangsters."  The prosecutor then turned his attention to Gonzales's argument that no evidence showed Gonzales had known and shared Soliz's intent to kill Skyles and Price:  "[H]ow can you possibly know that either one of those two men knew the other was going to commit a murder when he got out of the car . . . .  Well, Ladies and Gentlemen, I'll tell you why.  These are people who commit crimes together. . . .  [¶] If you looked at this crime in isolation, just as the one situation . . . you might be able to say how would they know what the other is going to do.  [¶] But, Ladies and Gentlemen, you're talking about people who robbed a market together.  You're talking about people who walked into the Hillgrove Market with guns and pointed them in the faces of two

61

people that owned that market. You're talking about two people who killed a 67-year-old man because he had the audacity to stand up to the people who came into his store. . . . [¶] So you're talking about two people who are not only members of the same gang, but they're people who at the time of the Skyles/Price murder had already committed another murder together: the Hillgrove Market robbery murder. They knew what each was about. They knew what each was going to do."

Gonzales contends the prosecutor's argument was an improper attempt to convict Gonzales of the Skyles and Price murders solely on the basis he had committed another crime (the Eaton murder) and was a person of generally bad character. As an initial matter, Gonzales's claim is forfeited for failure to object below. Gonzales acknowledges this failure, but argues the claim is nonetheless preserved because similar issues were raised by his pretrial motion to sever his trial from that of his codefendant, and any objections would have been futile given the trial court's denial of the motion. We reject the argument. The trial court's denial of the severance motion did not foreclose the asserted misconduct issue that Gonzales now raises. Trial counsel therefore was still required to make a specific objection to the prosecutor's arguments and seek an admonition from the court.

Turning to the merits of the claim, we reject Gonzales's characterization of the prosecutor's argument. Gonzales's contention presupposes the very claim we rejected in concluding that sufficient evidence supported his conviction for the Skyles and Price murders as an aider and abettor. The prosecutor did not assert Gonzales was guilty of the Skyles and Price murders solely on the basis that he committed the Eaton murder. As we have explained, and as the prosecutor explained in the remainder of his closing argument, the evidence at trial established that Gonzales knew of and shared Soliz's intent to murder Skyles and Price. Defendants were not only members of the same criminal gang, but also had

62

been partners in a previous fatal armed robbery. The jury could draw reasonable inferences from this evidence concerning whether Gonzales knew Soliz intended to assault Skyles and Price with a gun, when he and Soliz got out of the car to confront them at the gas station. The prosecutor's argument was proper, and there was no reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Smithey*, *supra*, 20 Cal.4th at p. 960.)

### b. Defense Counsel's Concession on the Lester Eaton Murder

The prosecutor began his rebuttal argument by stating he was going to focus primarily on the Skyles and Price murders because "both counsel essentially conceded their clients' guilt in the Hillgrove Market robbery murder in their closing arguments." After the prosecutor concluded his remarks and outside the presence of the jury, Gonzales's counsel objected that he had not in fact conceded Gonzales's guilt in the Hillgrove Market robbery murder. The prosecutor explained he had meant that Gonzales's counsel, because of his brief discussion of the Hillgrove Market robbery murder during closing argument, had implicitly conceded the issue, not that Gonzales's counsel had expressly conceded it.

The trial court overruled the objection, concluding that the prosecutor's comments did not amount to misconduct. The court agreed that Gonzales's counsel had not made an express concession, but reasoned that because Gonzales's counsel had devoted such a relatively brief portion of his closing argument to the Hillgrove Market robbery murder, the prosecutor and the jury could reasonably interpret this as tantamount to a concession. The trial court also noted the jury had been instructed that the statements of counsel were not evidence and were not to be regarded as such.

Gonzales contends the prosecutor's remarks were misconduct because they implied to the jury that defense counsel had stipulated to Gonzales's guilt for Eaton's murder. We disagree. We perceive no reasonable likelihood that the jury " 'construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey*, *supra*, 20 Cal.4th at p. 960.)

### c. Asserted "Attack" upon Defense Counsel

The prosecutor commented on photographs that defense counsel had introduced of the scene of the Skyles and Price murders. He argued the photos were "misleading" and "deceptive in terms of what a person standing in that position would see," and that they did "not accurately show what you would see based upon those lighting conditions." He urged the jurors to use their common sense to realize that photographs taken at another time and under unspecified lighting conditions were not necessarily an accurate representation of what an individual would have seen on the night of the shooting. He argued that Alejandro Garcia, the gas station clerk on duty the night of the shooting, had said as much in his testimony when he was asked about the accuracy of the photos and answered, "that's not what you'd see if you were a person standing there."

Gonzales contends the prosecutor committed misconduct with these remarks because they implied that defense counsel had presented false evidence to the jury. As an initial matter, the claim is forfeited for failure to object below. Turning to the merits, we see no misconduct. A prosecuting attorney " 'has the right to fully state his views as to what the evidence shows and urge whatever conclusion he deems proper.' " (*People v. Panah*, *supra*, 35 Cal.4th at p. 463, quoting *People v. Lewis* (1990) 50 Cal.3d 262, 283.) The prosecutor did not state or imply that defense counsel had presented false evidence to the jury; rather, the

64

prosecutor permissibly argued that the photographs could not substitute for the perceptions of the witnesses who were present during the shooting.

### 10. Cumulative Errors in the Guilt Phase

Gonzales contends that, even if no single error was prejudicial, the cumulative effect of the asserted guilt phase errors requires reversal of his conviction and death sentence. We conclude that any errors or assumed errors were nonprejudicial, whether reviewed separately or cumulatively, and thus reject the contention.

### C. Penalty Phase Issues

### 1. Asserted Conflict of Interest by Gonzales's Trial Counsel

Gonzales, joined by Soliz, contends that Gonzales's constitutional rights to counsel under the California and federal Constitutions were violated because his trial counsel, John Tyre, had a conflict of interest. As we discuss below, the evidence before the trial court showed that during the first penalty trial Tyre was used as an unwitting conduit by Gonzales's relatives, who hid drugs in the lining of clothing they asked Tyre to deliver to Gonzales in jail. As we conclude below, however, this incident did not adversely affect Tyre's representation of Gonzales.

At the time closing arguments took place during the penalty phase of the first trial, members of Gonzales's family (believed by the prosecutor to be his brother David Gonzales and his sister-in-law Kimberly Gonzales) delivered clothing to Gonzales's trial counsel, John Tyre, for Gonzales to wear during the remainder of the trial. A sheriff's deputy saw Tyre take possession of the clothing in the courtroom, and Tyre was continuously observed and accompanied by a sheriff's deputy as he carried the clothing to the sheriff's department lockup in the courthouse. The clothing was then searched by sheriff's personnel, who found 15 vials of heroin hidden in the lining.

In pretrial proceedings for the penalty retrial, the trial court addressed the question whether, because of the drug-smuggling incident, Tyre had a conflict of interest that would prevent him from representing Gonzales at the penalty retrial. Tyre was concerned that the prosecutor might call him as a witness or, at the least, mention his name in connection with the drug-smuggling incident, which would impair his effectiveness with the jury. The prosecutor stated that because Tyre was not responsible for the drug-smuggling incident, he saw no need to mention Tyre's name to the retrial jury in discussing it. The prosecutor noted, however, that David and Kimberly Gonzales, the family members he suspected of supplying the drug-laden clothing, had testified at the first penalty trial, and he wanted to retain his right to present the drug-smuggling incident as impeachment evidence against them if they testified at the penalty retrial. Because Tyre had no involvement in the drug-smuggling incident that would require him to be called as a witness, the trial court saw no conflict in allowing him to represent Gonzales at the penalty retrial. Tyre went on to represent Gonzales at the penalty retrial, at which neither David nor Kimberly Gonzales testified.

Gonzales contends the trial court erred in concluding that because Tyre would not be called as a witness at the penalty retrial, he could represent Gonzales free from any conflict of interest. Gonzales contends a conflict of interest still existed because the investigation of the drug-smuggling incident was ongoing at the time of the penalty retrial and, therefore, a "remote" possibility still existed that Tyre could have been prosecuted for the incident, which could have caused him to represent Gonzales less than vigorously.

" 'The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest.' " (*People v. Roldan* (2005) 35 Cal.4th 646, 673, quoting *People v. Cox*

66

(2003) 30 Cal.4th 916, 948.) While the classic example of a conflict in criminal litigation is a lawyer's dual representation of codefendants, the constitutional principle is not narrowly confined to instances of this type. (*People v. Hardy* (1992) 2 Cal.4th 86, 135.) A conflict may also arise when an attorney's loyalty to, or efforts on behalf of, a client are threatened by the attorney's own interests. (*Roldan*, at p. 673.)

Under the federal Constitution, prejudice is presumed when counsel suffers from an actual conflict of interest. (*Cuyler v. Sullivan* (1980) 446 U.S. 335.) This presumption arises, however, "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 692, quoting *Cuyler*, at p. 348.) An actual conflict of interest means "a conflict that affected counsel's performance — as opposed to a mere theoretical division of loyalties." (*Mickens v. Taylor* (2002) 535 U.S. 162, 171, italics omitted.) Under the federal precedents, which we have also applied to claims of conflict of interest under the California Constitution, a defendant is required to show that counsel performed deficiently and a reasonable probability exists that, but for counsel's deficiencies, the result of the proceeding would have been different. (*People v. Doolin* (2009) 45 Cal.4th 390, 421, & fn. 22 [disapproving former state law "informed speculation" standard of prejudice].)

Gonzales's argument that Tyre suffered from a conflict of interest seems strained in light of the prosecution's assurances to the judge that Tyre bore no responsibility in the drug smuggling incident. Nevertheless, assuming for purposes of argument that Tyre did suffer a conflict, determining whether his performance was adversely affected requires us to ask whether he "pulled his punches," i.e., whether Tyre failed to represent defendant as vigorously as he might have, had there been no conflict. (*People v. Roldan*, *supra*, 35 Cal.4th at

67

p. 674.)  In undertaking such an inquiry, we are bound by the record.  But where a conflict of interest causes an attorney *not* to do something, the record might not reflect such an omission.  (*Ibid.*)  We must therefore examine the record to determine (1) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (2) whether there may have been a tactical reason (other than the asserted conflict of interest) for counsel's omission.  (*Ibid.*)

Gonzales contends Tyre's conflict of interest had an adverse effect on Tyre's performance in three areas:  (1) in advising Gonzales about testifying at the penalty retrial; (2) in failing to call David and Kimberly Gonzales as witnesses; and (3) in failing to make objections during the prosecutor's cross-examination of Gonzales.  We conclude Gonzales fails to show any adverse effect on Tyre's performance in the three areas described.

As to the first, Gonzales claims that any reasonable attorney would have advised him not to testify, because, as he puts it, "little could be gained from appellant's testimony that he personally shot Skyles and Price."  It appears, however, that Tyre *did* advise Gonzales not to testify.  As Gonzales acknowledges, he took the stand in the penalty retrial over Tyre's objection.  Gonzales further contends that if the trial court had relieved Tyre and appointed a conflict-free attorney, he might have accepted that attorney's reasonable advice not to testify, or that an attorney without a conflict of interest would have prepared his client to testify rather than objecting to his testimony.  Both contentions reflect pure speculation, unsupported by anything in the record.

As to the second area of asserted deficient performance resulting from the conflict, Gonzales points to Tyre's decision not to call David and Kimberly Gonzales at the penalty retrial.  Under the circumstances, however, we conclude no competent counsel would have called them to testify.  Whatever mitigating

value their testimony had at the first penalty phase went to Gonzales's character, testimony given at the penalty retrial by five other witnesses including Gonzales's mother and two sisters. In the eyes of a jury, their attempt to smuggle narcotics to Gonzales in jail would have impaired both Gonzales's character and the witnesses' credibility. Similarly, we reject Gonzales's speculative contention that their failure to testify somehow brought about the death verdict at the penalty retrial. The most significant difference between the first penalty trial and the penalty retrial — and the most likely explanation for Gonzales's death verdict on retrial — was his own testimony that he was the shooter in both sets of murders.

As to the third area of asserted deficient performance, Gonzales contends Tyre did not adequately object to the prosecutor's cross-examination of him, in which he was asked whether witnesses had been lying when they presented a version of events that differed from his own. Gonzales contends the prosecutor asked "were they lying" questions a total of 19 times, but counsel failed to raise a single objection. Gonzales contends that "[b]ecause of the conflict, [Tyre] might have preferred to have [Gonzales's] testimony discredited by the prosecutor in order to avoid the possibility that anyone might believe a future claim by [Gonzales] that Mr. Tyre was responsible for smuggling the heroin, and not [Gonzales] or [his] brother and sister in law." The claim is speculative and unsupported by the record. Tyre was not silent during the prosecutor's cross-examination of Gonzales. He made three objections, one of which was an objection to the last of the "were they lying" questions. Gonzales fails to show any adverse impact on his representation. Consequently, we reject his conflict of interest claim.

69

## 2. *Retrial of the Penalty Phase Following a Hung Jury*

The court, as noted, proceeded to retry the penalty phase after the jury hung at the first penalty phase. Defendants contend that section 190.4, subdivision (b), which permits penalty retrials in this circumstance, violates the Eighth Amendment to the federal Constitution and its "evolving standards of decency" (*Trop v. Dulles* (1958) 356 U.S. 86, 101) because only a minority of the states currently authorizing the death penalty permit this procedure. We rejected an identical claim in *People v. Taylor* (2010) 48 Cal.4th 574, 633-634, and perceive in defendants' arguments no reason to revisit the issue.

## 3. *Limits on Voir Dire*

Defendants contend the trial court erroneously precluded them from questioning prospective jurors on lingering doubt and racial bias. Gonzales's counsel raised the latter issue only after the jury was impaneled. As we discuss below, we reject both claims of error.

### a. *Lingering Doubt*

The trial court distributed written questionnaires to the prospective penalty retrial jurors. The trial court stated it would allow some time for questioning, but the parties should not repeat questions from the written questionnaires. During voir dire, in a sidebar discussion with the court, defense counsel asked whether, after the death qualification voir dire, they would be allowed to pursue general voir dire questions with the pool of death-qualified prospective jurors, as had been done in the previous trial. The trial court answered that it was not going to engage in a separate session of general voir dire questioning because the retrial was on the narrower issue of penalty. The trial court stated, however, that if counsel could articulate a tentative challenge for cause, it would allow counsel to question a prospective juror. The parties then discussed further voir dire questions for certain prospective jurors in the area of death qualification. Finally, counsel for Soliz

70

raised the issue of questioning prospective jurors about their attitude regarding whether the first jury erred in its guilt determinations. Counsel argued that such questions were appropriate because the trial court presumably would instruct the jury on lingering doubt. The trial court stated that whether or not it instructed on lingering doubt, such questions were inappropriate at voir dire because the court had explained to the prospective jurors that, in the penalty retrial, the issue of guilt had already been decided.

As we discuss below, the trial court was not required to instruct on lingering doubt at the penalty phase retrial. To the extent Soliz contends that the trial court separately erred in refusing to allow voir dire questioning on lingering doubt, we reject this claim as well, and conclude the trial court acted within its discretion in conducting voir dire. (*People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 197.) As noted, the trial court was concerned that defense counsel's proposed line of voir dire questioning would conflict with the trial court's explanation to the prospective jurors that their task was to determine penalty, not to redetermine guilt. As we explain, *post*, in connection with the trial court's instructions, the trial court correctly described the jury's role in the penalty retrial, and we therefore see no abuse of discretion in the trial court's ruling.

### b. Racial Bias

Following the discussion of general voir dire and voir dire on lingering doubt described above, the trial court proceeded to peremptory challenges. All parties exercised a number of peremptories.[14] Both sides then accepted the panel, and the 12 jurors were sworn. The same process was used to select three alternate

---

[14] The prosecutor used 14 peremptory challenges, and counsel for Gonzales and Soliz used nine each.

jurors. The remaining prospective jurors were then excused. Later, after the newly impaneled jury had left the courtroom, counsel for Gonzales objected that, because voir dire had focused only on death qualification issues, he had not been allowed to question prospective jurors about "racial issues." Counsel stated that some jurors might be affected by the circumstance that two of the murder victims were African-American. The trial court replied that if counsel had asked to inquire on that subject, the court would have allowed it. The court stated: "I will remind you that in the voir dire that was conducted, mostly by me, that I went outside of the death penalty issues where I saw things that appeared to be of interest in the questionnaire and then I invited the attorneys to ask further questions, if they felt that there was anything else that needed to be explored as to a particular juror. And you did on a couple of occasions, and [on] other occasions you said you had no additional questions. And I gave you an open questioning period with almost all of the jurors." The trial court noted that defense counsel had exercised a great number of challenges and picked jurors that appeared to satisfy them. The court concluded that by failing to raise the subject during voir dire, counsel had effectively waived the issue.

The court then asked counsel for Gonzales whether he was asking for a mistrial. Counsel for Gonzales responded affirmatively and stated he did not think there was any other proper remedy. Counsel for Soliz joined in the motion, which the court denied.

"[A] capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." (*Turner v. Murray* (1986) 476 U.S. 28, 36-37.) As the high court further explained in *Turner*, however, defense counsel must request voir dire on the subject of racial prejudice; the trial court has no sua sponte duty to broach the subject. (*Id.* at p. 37, fn. 10.) Gonzales's trial counsel did broach the subject, but

only after the time for voir dire had ended and the jury had been sworn.  The only remedy that Gonzales's trial counsel suggested was a motion for mistrial, which the trial court denied.  Defendants contend for the first time on appeal that the trial court should have reopened voir dire to question the jurors about racial bias.

We turn first to the question of forfeiture.  Under *Turner v. Murray*, *supra*, 476 U.S. 28, if defense counsel had asked to question prospective jurors on racial bias during voir dire, the trial court would have erred had it refused that request.  Here, however, voir dire had been completed, and both the jury and the alternates had been sworn.  As Gonzales acknowledges, we have stated that "[o]bjections to the jury selection process must be made when the selection occurs." (*People v. Johnson* (1993) 6 Cal.4th 1, 23.)  Both at trial and on appeal, defense counsel have contended the trial court precluded questioning on racial bias because it told counsel they could not engage in "general voir dire."  The record is to the contrary.  The trial court directed trial counsel not to ask general questions about the jurors' backgrounds that had already been covered by the written questionnaires but gave counsel the opportunity to raise specific concerns, which counsel did, for example, in requesting that the trial court examine the prospective jurors on their attitudes toward lingering doubt.  Because defense counsel had the opportunity to raise the issue of questioning about racial bias but did not, defendants forfeited their rights under *Turner* to have the prospective jurors questioned on this subject.

Defendants also contend that, under *Turner* the trial court was compelled to reopen voir dire on the subject of racial bias even after jury selection was completed.  This claim was never raised below; the only remedy sought by defense counsel was a mistrial.  Defendants therefore have also forfeited this aspect of their claim.  Furthermore, were we to reach the merits of this argument, we would reject it.  *Turner* speaks only in terms of the right to question on racial

73

bias during voir dire; nothing in the opinion suggests a right to reopen voir dire. Indeed, *Turner* explains that its holding does not otherwise infringe on the trial court's control of voir dire: "The rule we propose is minimally intrusive; as in other cases involving 'special circumstances,' the trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively." (*Turner v. Murray*, *supra*, 476 U.S. at p. 37.) We therefore conclude that *Turner* did not compel the trial court to reopen voir dire.

Finally, Soliz contends the court should have granted the mistrial motion. A trial court's ruling denying a motion for mistrial is reviewed under the deferential abuse-of-discretion standard. (*People v. Price* (1991) 1 Cal.4th 324, 428.) Applying that standard, we see no abuse of discretion. Defense counsel did not indicate with any specificity how any of the sworn jurors might have harbored racial bias against defendants. Defense counsel did not place on the record the racial identities of any of the sworn jurors, nor indicate what racial group he was concerned would be biased against defendants, nor did he explain how this bias might express itself. Because defense counsel failed to present the potential prejudice to defendants as anything more than speculation, we see no abuse of discretion in the trial court's denial of the mistrial motion.

### 4. *Asserted* Witt *Error*

Gonzales, joined by Soliz, contends the trial court erroneously granted the prosecutor's challenge for cause against Prospective Juror No. 8763 based on her views concerning the death penalty. The argument lacks merit.

A prospective juror may be excused for cause based on his or her views of capital punishment when " 'the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions

74

and his oath.' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 7 [127 S.Ct. 2218, 2223], citing *Wainwright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*).)  Applying *Witt*, we have stated:  " ' " ' "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate.' [Citation.]" [Citation.]  In addition, " '[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous.' [Citations.]" ' " (*People v. Blair* (2005) 36 Cal.4th 686, 743; see *People v. Jenkins* (2000) 22 Cal.4th 900, 987.)

Prospective Juror No. 8763, in her answers to several questions on the jury questionnaire, indicated her view that only God should judge whether a person should be put to death for crimes.  During voir dire, the trial court asked her whether, as a consequence of this belief, she would be unable to impose the death penalty.  She affirmed her view was that only God could decide.  However, when asked whether she as a juror would vote only for life in prison without parole regardless of the evidence and no matter how horrible the crime, she acknowledged that "as a last resort" and if all the evidence were against a defendant, she would vote for death.  She also expressed her concern that if she voted for death it would trouble her conscience and haunt her dreams.  Counsel for Soliz asked her whether she would be able to consider the prosecutor's evidence in aggravation, to which she answered:  "I don't know, to be honest.  It's really hard and difficult for me to do that.  And I have pondered this since I've been asked that question. . . .  And I still truly believe that only God should allow a person — or put a person to death.  I don't feel in true judgment that it's up to me to do that."  The trial court granted the prosecutor's challenge for cause.

75

Gonzales contends that although Prospective Juror No. 8763 had strong religious feelings, she did not hold views that, under *Witt*, *supra*, 469 U.S. 412, would prevent or substantially impair her performance as a juror. Gonzales points to her statement that "as a last resort" and if all the evidence were against a defendant, she would vote for death. However, considered as a whole, this prospective juror's statements in the written questionnaire and in her voir dire questioning indicated that her religious views would prevent her from considering a sentence of death. To the extent she gave conflicting answers, the trial court reasonably resolved those conflicts in determining her true state of mind. Because the trial court's determination is fairly supported by the record, we defer to it. (*People v. Blair*, *supra*, 36 Cal.4th at p. 743.)

### 5. *Refusal to Advise the Penalty Retrial Jurors of the Verdict Received by Gonzales in the First Penalty Phase*

As noted, the jury at the first penalty trial returned a verdict of life without the possibility of parole (LWOP) for Gonzales for the murders of Skyles and Price, hung on penalty for Gonzales as to the murder of Easton, and hung on penalty for Soliz as to all of the murder counts. During pretrial proceedings for the penalty retrial, the parties discussed what the prospective jurors should be told about the first trial. Counsel for Gonzales argued that the penalty retrial jury should be informed of the LWOP verdict Gonzales received because it was a relevant mitigating factor. The prosecutor objected that the verdict was irrelevant to the penalty retrial jury's task of determining penalty for the hung counts, and that revealing the prior jury's verdict would be an inappropriate attempt to influence the current jury. The trial court sustained the prosecutor's objections and denied Gonzales's request. The jury was told only that, in the previous trial, the jury had reached verdicts as to the appropriate penalty for Gonzales for the murders of Skyles and Price, but that this verdict was not before them and the

76

decision they were to make was what punishment should be imposed on Gonzales for the murder of Eaton.

Gonzales contends the trial court's refusal to inform the penalty retrial jury of his LWOP verdict for the Skyles/Price murders violated his federal and state constitutional rights. Gonzales points to the broad range of evidence that a defendant may introduce as a mitigating factor during the penalty phase of a capital trial: " '[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " (*Eddings v. Oklahoma* (1982) 455 U.S. 104, 110, quoting *Lockett v. Ohio* (1978) 438 U.S. 586, 604 (plur. opn.).) However, as we have noted, "[a]t the same time, . . . the United States Supreme Court has made clear that the trial court retains the authority to exclude, as irrelevant, evidence that has no bearing on the defendant's character, prior record or the circumstances of the offense." (*People v. Frye* (1998) 18 Cal.4th 894, 1015, citing *Lockett*, at p. 604, fn. 12.) We have previously rejected claims that " 'the trial court is required to inform the jury of the history of the prior proceedings' " (*People v. Wash* (1993) 6 Cal.4th 215, 254, quoting *People v. Edwards* (1991) 54 Cal.3d 787, 845), including sentences received by codefendants and accomplices (*People v. Mincey* (1992) 2 Cal.4th 408, 479; *People v. Bemore* (2000) 22 Cal.4th 809, 857-858), whether the previous penalty jury was deadlocked (*People v. Hawkins* (1995) 10 Cal.4th 920, 967-968), and whether the penalty retrial was the result of an appellate reversal of an earlier death judgment (*Wash*, at p. 254). Similarly, we reject Gonzales's claim that the trial court was required to inform the penalty retrial jury of the first penalty jury's LWOP verdict for Gonzales for the murder of Skyles and Price. That verdict was

not relevant to the task of the penalty retrial, which was to determine penalty for those counts *not* rendered by the first penalty jury.

### 6. Berber's Testimony at the Penalty Retrial

Defendants contend the trial court erred in admitting, over defense objections, a statement by prosecution witness Salvador Berber. Berber had worn a wire and recorded his conversation with Gonzales while the two were being transported in a sheriff's van. When Berber testified at the penalty retrial, the prosecutor asked him whether he lived in La Puente, to which he answered "no." The prosecutor asked Berber what would happen if he went back to La Puente. Counsel for Gonzales objected, but stated no ground for the objection. The trial court overruled the defense objection, and Berber testified, "they'd kill me." Gonzales contends this statement was inadmissible because it described an uncorroborated threat by defendants against Berber. We reject this claim for the same reason given in our discussion of the admission of alleged threats against Berber at the guilt phase, namely, that Berber's statement does not fairly imply defendants had threatened him. Rather, his statement indicates simply that Berber feared codefendants and the Puente gang. "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible." (*People v. Burgener*, *supra*, 29 Cal.4th at p. 869.) The trial court did not err in overruling the objection and admitting the statement.

### 7. Prosecutor's Cross-examination of Gonzales

Gonzales testified at the penalty retrial that he and Soliz committed the robbery at the Hillgrove Market and that he, Gonzales, shot Lester Eaton. He further testified that he was the shooter and the sole participant in the Skyles and Price murders, and that Soliz had remained in the car during the confrontation.

78

During the prosecutor's lengthy cross-examination, Gonzales broadly denied the accounts of events given by various prosecution witnesses, including: (1) that he and Soliz had been dressed the way Betty Eaton had described them when they robbed the Hillgrove Market; (2) that he and Soliz had been on Perth Street preparing for the robbery as described by Dorine Ramos; (3) that both he and Soliz had exited the car to confront Skyles and Price, as Judith Mejorado had testified; (4) that Soliz was the shooter, as Carol Mateo, Judith Mejorado, Jeremy Robinson and Alejandro Garcia had testified; and (5) that Deputy Esquivel had found a jail-made shank in his cell, as Esquivel had testified. In cross-examining Gonzales on these points, the prosecutor frequently asked questions in the form, "were they lying," of which the following exchange is representative: "Q [Prosecutor]: Carol Mateo was lying when she came in here to court and said Michael Soliz was the man she saw pulling the trigger? [¶] A [Gonzales]: Yes. [¶] Q: And she was lying when she testified at the earlier trial in this case and said the same thing? [¶] A: Yes. [¶] Q: And she was lying when she said the same thing at the preliminary hearing? [¶] A: Yes."

Defendants contend the prosecutor committed misconduct by repeatedly asking Gonzales whether he thought prosecution witnesses were lying when they gave accounts of events that differed from his. As we conclude below, the claim is forfeited because defendants failed to object, but were we to address the merits, we would conclude the questioning did not constitute misconduct and was harmless in any event.

Counsel for Gonzales did not object on any grounds to the "were they lying" questions until the very last question.[15] Counsel for Soliz objected midway through the cross-examination, but on grounds that the prosecutor mischaracterized Gonzales's testimony, not that the "were they lying" questions were generally improper. His objection therefore did not specify the objection defendants now raise on appeal; consequently the claim is forfeited. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20-21.) Even assuming the claim was preserved for review, it lacks merit.

In *People v. Chatman* (2006) 38 Cal.4th 344, we discussed the propriety of a prosecutor's use of "were they lying" questions. We observed that "[a] defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide insight on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken." (*Id.* at p. 382.) We concluded: "[C]ourts should carefully scrutinize 'were they lying' questions in context. They should not be permitted when argumentative, or when designed to elicit testimony that is irrelevant or speculative. However, in its discretion, a court may permit such questions if the witness to whom they are addressed has personal knowledge that allows him to provide competent testimony that may legitimately assist the trier of fact in resolving credibility questions." (*Id*. at p. 384.)

Gonzales was a percipient witness to the events at issue. Two of the witnesses whose testimony he contradicted, Dorine Ramos and Judith Mejorado,

---

**15** Counsel for Gonzales did object as argumentative to the prosecutor's last question on cross-examination, "All those other people, they conspired together to lie against you and [Soliz]?" The trial court sustained the objection.

associated with gang members, and Gonzales also knew Judith personally. Consequently, the prosecutor's use of "were they lying" questions regarding the testimony of these two witnesses gave Gonzales the opportunity to address any gang-related or personal reasons that might have caused these witnesses to describe events at variance with Gonzales's account. (Cf. *People v. Chatman*, *supra*, 38 Cal.4th at p. 383.) Gonzales did not personally know or have any connection with the remainder of the witnesses whose accounts he denied. However, even assuming the "were they lying" questions directed towards this latter set of witnesses were argumentative, the prosecutor's conduct did not rise to the level of reversible error.

A defendant's conviction will not be reversed for prosecutorial misconduct unless it is reasonably possible that the jury would have reached a result more favorable to the defendant had the misconduct not occurred. (*People v. Williams* (2010) 49 Cal.4th 405, 464; *People v. Brown* (1988) 46 Cal.3d 432, 448-449.) Defendants contend the prosecutor's use of "were they lying" questions improperly undercut Gonzales's credibility as a witness, and thereby undercut the value that Gonzales's testimony had for either defendant.[16] Soliz observes the prosecutor asked Gonzales at least 19 times whether other witnesses had lied. However, the "were they lying" questions, in context, were a small part of a lengthy cross-examination spanning 60 pages in the reporter's transcript. We thus

---

**16** For Soliz, Gonzales's testimony was useful because Gonzales asserted that Gonzales had been the shooter and sole participant in killing Skyles and Price, thus contradicting the testimony of prosecution witnesses that Soliz was the shooter. For Gonzales, the possible value of his testimony was that it portrayed his shooting of Lester Eaton as a result of a struggle for a gun rather than as a premeditated killing.

81

do not agree with defendants' contention that the questions constituted the most prominent and damaging aspect of the prosecutor's cross-examination.

Furthermore, independent of the "were they lying" questions, the prosecutor's substantive questioning of Gonzales severely undermined his credibility. For example, Gonzales initially claimed that Soliz did not have a gun at the Hillgrove Market robbery, but the prosecutor forced him to retract the claim by confronting him with his other statements acknowledging that Soliz did carry a gun during the robbery. Similarly, the prosecutor undercut Gonzales's claims of remorse for the Eaton murder by confronting him with the callous statements he had made about killing Eaton in his tape-recorded conversation with Berber.[17] Gonzales attempted to discount these statements as "bragging" and "bullshitting." In so doing, he indirectly reinforced the prosecutor's argument that his claim in the same conversation to have shot Skyles and Price personally was bragging that exaggerated his actual role in that crime as Soliz's aider and abettor. Throughout the cross-examination Gonzales was often evasive and sometimes patently

---

**17**  Gonzales told Berber:  "I done about three — two niggers and that old man — . . . when I got out this time.  Fuck that," and, "They tried to make him [Lester Eaton] out to be, 'Oh, he's more, he's more than a butcher, more like a' — motherfucker — 'more than a father figure, too.  He wasn't only a butcher, but a father figure, too.'  Says in the paper.  I don't want to hear that bullshit.  Smoke the motherfucker."  Later, after the penalty retrial verdicts, in reviewing the sentence of death under section 190.4, subdivision (e), the trial court made particular note of the powerful aggravating effect of the latter taped comment:  "[I]n the statement that he made at the time of his recorded conversation to a fellow inmate, he not only showed a complete lack of remorse but took a certain amount of pride in what he had done and spoke contemptuously of the victim, saying that the newspaper accounts had said that he was a father figure in the community and that he had absolutely no regard for that and that his attitude was an obscenity as to what Mr. Eaton's life had been and a complete lack of contrition and remorse."

unbelievable, as when he asserted there was no reason for both defendants to have been armed in the Hillgrove Market robbery.  In sum, even if the prosecutor had not used the "were they lying" questions, it is not reasonably possible the jury would have regarded Gonzales's testimony with greater credibility or that the verdict would have been different.

### 8. *Judge's Comments During Gonzales's Testimony*

After the prosecutor had cross-examined Gonzales at the penalty retrial, counsel for Soliz also cross-examined him.  Counsel's ostensible goal was to bolster Gonzales's testimony that Gonzales, not Soliz, had been the shooter and the sole participant in the Skyles and Price murders.  Under counsel's questioning, Gonzales testified that he shot Skyles and Price because one of them "made a move like he had something" and Gonzales "just reacted."  After counsel finished his cross-examination, the prosecutor recross-examined Gonzales and asked him why he had fired a total of 11 shots at Skyles and Price.  Gonzales testified that the gun fired automatically once he put his finger on the trigger.  When the prosecutor questioned how this was possible, since the nine-millimeter gun was semiautomatic, Gonzales stated that he had "rigged" the gun to be fully automatic.  This resulted in the following exchange:  "Q [prosecutor]:  Explain to the jury how you rigged that one to be fully automatic.  [¶] A [Gonzales]:  I think it's the firing pin, the spring to the firing pin, or something like that.  You just take it out, something in there, and it just keeps going fully automatic instead of semi.  [¶] Q:  What did you do to do that?  [¶] A:  Just like I said.  Something inside there.  A piece that you take off.  [¶] Q:  What is it that's inside?  [¶] A:  I think it's a spring.  [¶] Q:  Is it a spring?  [¶] A:  Yeah.  I think it's a spring.  [¶] Q:  Where does the spring go to?  [¶] A:  To the trigger.  The back of the trigger.  [¶] Q:  . . . when did you do that?  [¶] A:  Right before."

83

At this point, the trial court interjected: "The Court will take judicial notice of the fact that you cannot render a semiautomatic fully automatic by any manipulation with a spring behind the trigger. That is a physical impossibility with that weapon. The court knows from its own experience." The prosecutor then resumed questioning, asking Gonzales whether it was his testimony "that you shot them so many times because basically you couldn't stop pulling the trigger. Is that fair to say?" Gonzales replied, "Yeah. I don't know how many times. I kept pulling it. But, you know, it's what happened. . . . I don't know how many bullets came out."

After Gonzales finished his testimony, the parties outside the hearing of the jury addressed the trial court and objected to the court editorializing about the gun. The trial court apologized, stating: "I'm sorry, but when you have something as basic as that, it's as though you would say that you could render it automatically — make it fully automatic by putting a piece of chewing gum in the magazine. . . . It was just utter nonsense, and it's so obviously palpably untrue."

After the penalty retrial jury returned its verdicts, trial counsel for both defendants moved for a new trial on various grounds, including the trial judge's comments about altering the semiautomatic gun. In responding to Soliz's counsel's contention that the court's comment destroyed Gonzales's credibility, the court acknowledged that "it was probably error for the court to have made the comment that it did at the time based on the court's personal knowledge, having carried a semiautomatic weapon as an officer in the Marine Corps as a side arm. And, in a sense, I was an uncross-examined expert witness, which I certainly did not intend to be." The court concluded, however, "that under the totality of the circumstances it was harmless error and it did not affect the judgment of the jury as, in fact, they rejected the whole of Mr. Gonzales's testimony as to the killing of Skyles and Price." In addressing Gonzales's counsel's similar argument, the trial

84

court again stated that the credibility of Gonzales was "de minimus, because the effect of the judgment of credibility that they [the jurors] made can go to the totality of Mr. Gonzales's testimony both on direct and cross-examination where . . . his credibility was just practically zero as far as the jury was concerned, except insofar as he admitted the killing of Lester Eaton, which the evidence was overwhelming."

Defendants contend the trial judge committed reversible error by taking judicial notice of the physical impossibility of Gonzales's testimony that he had converted a semi-automatic gun into a fully automatic one by altering the trigger-spring. The judge's comment, defendants argue, undercut Gonzales's credibility as a witness and thereby diminished the value Gonzales's testimony had for both defendants. (See, *ante*, fn. 16.) As we conclude below, although the trial court erred in making the comment, it does not amount to reversible error.

As an initial matter, the Attorney General contends defendants' claim is forfeited because trial counsel below did not timely object to the court's comment and request an admonition. (See *People v. Melton* (1988) 44 Cal.3d 713, 735 ["The purpose of the rule requiring timely objection is to give the trial court the opportunity to cure any error, if possible, by an admonition to the jury."].) We note that defense counsel did not immediately approach the court about its comments and that, in the meantime, Gonzales had changed his testimony from his having rigged the gun to stating that he had pulled the trigger multiple times. Once Gonzales had changed his testimony, it is not clear that requesting an admonition would have remedied the asserted prejudice to his credibility. We need not decide, however, whether defense counsel's objection was sufficient to preserve the claim because, as we explain below, even assuming the claim was preserved, any error was harmless.

85

The proposition that a semiautomatic weapon cannot be easily rendered fully automatic is not a proper subject for judicial notice because it is neither "so universally known that [it] cannot reasonably be the subject of dispute" (Evid. Code, § 451, subd. (f)) nor "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" (*id.*, § 452, subd. (h)). Because the trial court erred, we analyze the error's possible prejudicial effect. "We 'evaluate the propriety of judicial comment on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury.' [Citation.]" (*People v. Sanders* (1995) 11 Cal.4th 475, 531-532.)

In the context of Gonzales's testimony, the trial court's comments were harmless because, as the trial court observed, Gonzales's credibility was already seriously impaired. The prosecutor's cross-examination had impaired Gonzales's credibility in recounting the details of the two sets of shootings: while Gonzales asserted he had been the actual shooter in both instances, he nevertheless sought to minimize his responsibility and gave implausible explanations when confronted with the details. For example, the physical evidence indicated that Lester Eaton had been shot five times. When asked to explain why he had shot him five times, Gonzales claimed that his mind had gone blank during the shooting and he could not remember firing any of the shots, although he remembered everything else about the robbery. Again, when the prosecutor asked him why he had fired multiple shots at Skyles and Price, Gonzales sought to minimize his culpability by claiming to have pulled the trigger only once, giving a vague and unpersuasive account of how he had altered the gun to be fully automatic.

Because Gonzales's credibility to the jury was already seriously impaired by the time the trial court made its comments on semiautomatic weapons, we conclude that any error of state law was harmless under the "reasonable

possibility" standard of *People v. Brown*, *supra*, 46 Cal.3d at pages 448-449.[18] Assuming for the sake of argument the judge's comments implicated the due process clause of the federal Constitution (U.S. Const., 14th Amend.), we conclude for the same reasons they were harmless under the "beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, 23-24.

### 9. Other-crimes Evidence

As evidence in aggravation, the prosecutor presented evidence that both defendants had engaged in prior unadjudicated criminal acts involving the threat of force or violence. (§ 190.3, factor (b).) Defendants contend the trial court made a variety of errors in admitting and instructing the jury concerning this evidence. As we discuss below, the trial court did not err.

### a. Other-crimes Evidence as to Gonzales

While Gonzales was incarcerated in jail, a sheriff's deputy found a sharpened four-inch metal shank in his cell. Gonzales contends the trial court erred in failing to instruct the jury sua sponte on the elements of the crime of possession of a deadly weapon in jail. As Gonzales acknowledges, however, we

---

[18] Gonzales also claims state law error on the ground that the trial court violated Evidence Code section 703, subdivision (b), which provides: "Against the objection of a party, the judge presiding at the trial of an action may not testify in that trial as a witness. Upon such objection, the judge shall declare a mistrial and order the action assigned for trial before another judge." Gonzales contends this statute contains no harmless error exception. However, article VI, section 13 of the California Constitution states in relevant part: "No judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Assuming for the sake of argument that the trial court violated Evidence Code section 703, subdivision (b), we conclude there was no miscarriage of justice, for the same reasons set out above.

87

have frequently held that a trial court has no sua sponte duty to instruct the jury on the elements of other crimes that are introduced at the penalty phase. (*People v. Carter*, *supra*, 30 Cal.4th at p. 1220.) We therefore reject Gonzales's claim.

### b. Other-crimes Evidence as to Soliz

Soliz and several other inmates started a fire in their cellblock using burning newspaper and a smoldering mattress. When a sheriff's deputy attempted to extinguish the fire, Soliz and the other inmates pelted him with fruit and full milk cartons. Soliz contends the fire was a "mere annoyance," which did not involve the use of force and therefore should have been excluded. We have concluded, however, that starting a fire in jail is an act of arson, which involves force, and is admissible under section 190.3, factor (b). (*People v. Lewis*, *supra*, 26 Cal.4th at pp. 391-392 [arson in jail exposes both officers and inmates to physical danger].)

On two separate occasions while Soliz was incarcerated in jail, sheriff's deputies discovered several razors and altered razors in his single-man cell. Soliz contends the trial court erred in instructing on these incidents because the court failed to specify the elements of the alleged offenses. This claim is functionally identical to Gonzales's similar claim, discussed above, and we reject it for the same reason: A trial court has no sua sponte duty to instruct on the elements of "other crimes" offered under section 190.3, factor (b). (*People v. Davenport* (1985) 41 Cal.3d 247, 281-282.) Soliz also contends the evidence was not admissible under factor (b) because mere possession of razor blades in custody is not an implied threat or use of force or violence. As Soliz acknowledges, however, we have already rejected this argument. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589.)

### *10. Refusal to Instruct on Lingering Doubt*

At the penalty retrial, the trial court refused defendants' proposed lingering doubt instructions, stating that such an instruction is only appropriate when the same jury that decides guilt also decides penalty. Defendants contend the trial court thereby erred. To the contrary, as we explain below, the trial court was not required to instruct on lingering doubt and did not err in refusing to do so.

At the penalty retrial, both the prosecution and the defense extensively discussed the circumstances of the capital crimes. The prosecutor called the same witnesses and presented substantially the same evidence concerning the capital crimes at the penalty retrial as he did at the guilt phase trial. Counsel for defendants presented arguments in mitigation based on defendants' version of the circumstances of the capital crimes. Gonzales's counsel argued that the murder of Lester Eaton was an accidental killing rather than a premeditated murder. As to the Skyles and Price murders, Gonzales's counsel argued that Gonzales never got out of the car when Soliz shot Skyles and Price, and if he did get out of the car, he did nothing to aid Soliz in the shooting. Counsel for Soliz argued that Gonzales, not Soliz, shot Skyles and Price and that this was proven by Gonzales's admissions to Berber and by Gonzales's testimony on the stand.

As defendants acknowledge, we have frequently and consistently rejected claims that the trial court is required to instruct on lingering doubt. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1314.) Defendants contend, however, that a lingering doubt instruction is crucial in a penalty *retrial* because a jury that has not decided guilt decides penalty. Defendants argue that the lack of a lingering doubt instruction prevented the jury from adequately considering defense arguments in mitigation based on the circumstances of the capital crimes because the penalty retrial jury was told it was not allowed to redetermine the guilt phase verdicts.

We considered a similar claim in *People v. DeSantis* (1992) 2 Cal.4th 1198, 1239. "Inevitably," we explained, "there will be a tension between the legislatively stated preference not to retry the question of guilt at the second penalty phase trial (§ 190.4, subd. (b)) and the defendant's right to ensure that the jury consider evidence that might raise a doubt, albeit amorphous or slight, that his role was less heinous than the prior jury's findings established." (*DeSantis*, at p. 1239.) We found it unnecessary to resolve whether this tension could ever require a lingering doubt instruction because, given the record presented, the defendant "was able virtually to retry the guilt phase case under the guise of introducing evidence of the circumstances of the crime to the penalty jury." (*Id*. at pp. 1239-1240.) "[T]he jury was steeped in the nuances of the case, much as if the same jury had decided guilt and penalty." (*Id*. at p. 1240.) Our reasoning in *DeSantis* applies equally to this case because the jury was similarly "steeped" in the facts of the capital crimes. Had the penalty retrial jury been convinced by defendants' arguments in mitigation based on the circumstances of the capital crimes, it could have used section 190.3, factors (a) and (k), as expressed in CALJIC No. 8.85, to return a verdict of life imprisonment without parole instead of death. It needed no lingering doubt instruction to do so. (*People v. Zamudio* (2008) 43 Cal.4th 327, 370 [CALJIC No. 8.85 sufficiently covers concept of lingering doubt].)

*People v. Gay* (2008) 42 Cal.4th 1195, cited by defendants, is inapposite. Unlike the trial court in this case, the court in *Gay* had instructed the penalty retrial jury on lingering doubt, but had limited the evidence the defense could offer and had informed the jury the defendant's responsibility for the shooting had been conclusively proven by the guilt phase verdicts and no evidence to the contrary would be presented. (*Id.* at p. 1224.) We reversed the judgment because "[t]he combination of the evidentiary and instructional errors present[ed] an intolerable

90

risk that the jury did not consider all or a substantial portion of the penalty phase defense, which was lingering doubt." (*Id*. at p. 1226.) *Gay* is essentially the converse of the present case: In *Gay*, the trial court instructed the jury on lingering doubt, but precluded the defendant from presenting that defense; in the present case, the trial court allowed defendants to present and argue their lingering doubt defenses, but refused to specifically instruct on lingering doubt. As we stated in *Gay*, our holding there was not based on any state or federal constitutional right to a lingering doubt instruction; rather, it was based on California's death penalty statute, which authorizes the admission of evidence of innocence at a penalty retrial. (*Id*. at p. 1220.) *Gay* is consistent with our prior holdings that a lingering doubt instruction is not required; indeed, *Gay* cites *People v. DeSantis*, *supra*, 2 Cal.4th 1198, with approval. (*Gay*, at pp. 1227-1228.) We therefore reject defendants' claim that the trial court erred in not instructing on lingering doubt.

### 11. *Refusal to Instruct on Mercy*

Defendants contend the trial court erroneously refused to instruct the jury that it could apply mercy and sympathy as a basis for returning a verdict of life imprisonment without the possibility of parole. We see no error. As defendants acknowledge, the trial court gave the standard instruction on the factors in aggravation and mitigation, which explains that the jury may consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (CALJIC No. 8.85; see also § 190.3, factor (k).) " 'We have repeatedly held that a jury told it may sympathetically consider all mitigating evidence need not also be expressly

91

instructed it may exercise "mercy." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 344, quoting *People v. Stanley* (1995) 10 Cal.4th 764, 840.)

### 12. *Failure to Instruct on Gonzales's Age as a Mitigating Factor*

Gonzales was 19 years old at the time of the murders charged in this case. Gonzales, joined by Soliz, contends the trial court erred when it refused Gonzales's proposed special instruction on his age at the time of the crimes as a factor in determining penalty, based on language in *People v. Lucky* (1988) 45 Cal.3d 259, 302.[19]  However, the trial court properly refused the special instruction, because age was adequately covered by section 190.3, factor (i), as expressed in CALJIC No. 8.85, which instructed the jury to consider "the age of the defendant at the time of the crime" as a factor in determining penalty.

We found no error in the court's rejection of the same proposed instruction in *People v. Ramirez* (2006) 39 Cal.4th 398, 472-473.  As we observed, no special or unusual age-related factors were presented in that case, and, likewise, none are presented here.  "Accordingly, the court's instruction to consider defendant's age, without further elaboration, was sufficient . . . ." (*Id.* at p. 473.)

### 13. *Omission of Evidentiary Instructions*

At the penalty retrial, the trial court gave the standard penalty phase instructions but failed to instruct the jury with the applicable evidentiary

---

**19**    The proposed instruction read:  "One of the factors for you to consider in determining the penalty is the age of the defendant at the time of the offenses. [¶] Chronological age, by itself, is a matter over which the defendant has no control, and which is not relevant to the choice of penalty.  [¶] However, the factor relating to defendant's age, as set forth in these instructions, refers to any matter concerning defendant's age, maturity, and judgment which common experience or morality might indicate to be relevant to the issue of penalty.  [¶] You shall therefore give any such age-related factors and argument consideration in arriving at a judgment as to penalty."

92

instructions set out in CALJIC Nos. 1.00 through 2.92.[20] Soliz and Gonzales contend, and the Attorney General acknowledges, that the trial court erred in not giving the evidentiary instructions. However, as we conclude below, following *People v. Carter*, *supra*, 30 Cal.4th at pages 1221-1222, any error in omitting the instructions was harmless under state and federal standards of review.

As an initial matter, Soliz contends the error here is structural and cannot be assessed under a harmless error standard because, unlike in *People v. Carter*, *supra*, 30 Cal.4th 1166, the trial court also gave an abbreviated reasonable doubt instruction, omitting the first paragraph of CALJIC No. 2.90, which sets out the presumption of innocence and specifies that the prosecutor bears the burden of proof. We reject the contention. The penalty phase jury need not be instructed as to any burden of proof in selecting the penalty to be imposed. (*People v. Burgener*, *supra*, 29 Cal. 4th at p. 885.) A penalty phase jury is, however, instructed about reasonable doubt in connection with section 190.3, factors (b) and (c), namely, that before the jury can consider any prior felony convictions or any unadjudicated violent criminal activity as aggravating circumstances, it must be satisfied beyond a reasonable doubt that the defendant had in fact been convicted of the prior crime or committed the unadjudicated criminal activity. (*People v. Morrison* (2004) 34 Cal.4th 698, 730-731; *People v. Williams*, *supra*, 49 Cal.4th at p. 459.) The trial court so instructed the jury here with CALJIC Nos. 8.86 and 8.87, and defined reasonable doubt with the second paragraph of CALJIC No.

---

[20] The omitted evidentiary instructions included, among other things, CALJIC Nos. 2.01 (sufficiency of circumstantial evidence), 2.20 (believability of witnesses), 2.22 (weighing conflicting testimony) and 2.80 (expert testimony).

2.90.[21] A trial court need not instruct on the presumption of innocence and the burden of proof in defining reasonable doubt for CALJIC Nos. 8.86 and 8.87 at the penalty phase; the court is required only to give the definition of reasonable doubt that comprises the second paragraph of CALJIC No. 2.90. (*People v. Welch* (1999) 20 Cal.4th 701, 768.) We have so held both when the same jury decides guilt and penalty and also when, as here, a second jury determines penalty. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1190-1191 [same jury]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1189, 1228 [penalty retrial jury].) We therefore reject Soliz's structural error argument and consider whether the court's failure to give the evidentiary instructions caused harm.

In *Carter*, the trial court instructed the jury at the penalty phase with CALJIC No. 8.84.1, which tells the jury to disregard the guilt phase instructions, but the court neglected to reinstruct the jury with applicable evidentiary instructions from CALJIC Nos. 1.00 through 3.31. (*People v. Carter*, *supra*, 30 Cal.4th at p. 1218.) We rejected the contention the omission of the evidentiary instructions necessarily required reversal, and conducted harmless error analysis to determine whether it was likely the omitted instructions affected the jury's evaluation of the evidence. (*People v. Moon* (2005) 37 Cal.4th 1, 38.) Although the present case involves a penalty retrial jury that received no evidentiary instructions (rather than, as in *Carter*, a jury that received evidentiary instructions

---

**21** "Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." (CALJIC No. 2.90 [2d par.].)

94

at the guilt phase but was instructed to disregard them at the penalty phase), the same principle logically applies.

Soliz contends the omission of evidentiary instructions prevented the jury from properly evaluating Gonzales's testimony at the penalty retrial, and that this prejudiced Soliz's defense that Gonzales, not Soliz, had shot Skyles and Price. One of the omitted instructions, CALJIC No. 2.01, tells jurors that if the circumstantial evidence permits two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, the jury must adopt that interpretation that points to the defendant's innocence. Soliz contends the omission of this instruction prevented the jury from using Gonzales's statement that Gonzales shot Skyles and Price to reject the testimony of prosecution witnesses that Soliz was the shooter. But the conflict between Gonzales's account of the shooting and that presented by the prosecution witnesses was a conflict between purported eyewitnesses to the event; this is a conflict between direct, not circumstantial, evidence. (See CALJIC No. 2.00 ["Direct evidence is evidence that directly proves a fact. It is evidence which by itself, if found to be true, establishes the fact."].) The case against Soliz as the shooter of Skyles and Price did not depend primarily on circumstantial evidence. [22] Even without CALJIC No. 2.01, therefore, the jury could adequately assess Gonzales's credibility in relation to the credibility of the witnesses who identified Soliz as the shooter.

---

[22] The prosecution did present circumstantial evidence in showing that a live round found in the getaway van used in the Hillgrove Market robbery murder bore the same magazine markings as the expended shells found at the scene of the Skyles and Price murders. This evidence, however, was consistent with either Gonzales or Soliz being the shooter of Skyles and Price. The prosecutor's case that Soliz was the shooter depended on the eyewitness testimony.

In a similar argument, Soliz asserts prejudice from the omission of CALJIC No. 2.22, which instructs the jury that it should not decide a factual issue based merely on the number of witnesses testifying to a certain version of events. Soliz argues that, lacking this instruction, the jury did not appreciate that it could use Gonzales's testimony alone to reject a death verdict for Soliz for the Skyles and Price murders. But the prosecutor never made the argument that the prosecution's version of events was true simply because more than one witness testified to it. Rather, the prosecutor pointed to the credibility of the witnesses who had identified Soliz as the shooter and the fact they had done so independently of each other. The prosecutor also pointed to Gonzales's lack of credibility on the stand, and pointed out the reasons why Gonzales might falsely have claimed to be the shooter of Skyles and Price. Even without being instructed with CALJIC No. 2.22, therefore, the jury could adequately assess Gonzales's credibility in relation to the prosecution witnesses.

Soliz also asserts prejudice from the omission of CALJIC No. 2.80, which instructs a jury on evaluating expert testimony.[23] Soliz contends Detective Lusk gave significant opinion testimony supporting the prosecution's theory that Gonzales had exaggerated his role in the Skyles and Price murders. Lusk also testified that the Skyles and Price murders could have been committed in retaliation for a prior killing of a fellow Puente gang member. Soliz contends that

---

[23]     Soliz alludes to the following relevant parts of CALJIC No. 2.80: "An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved, or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based. [¶] You are not bound by an opinion. Give each opinion the weight you find it deserves. You may disregard any opinion if you find it to be unreasonable."

without CALJIC No. 2.80, the jury may have felt bound by Lusk's opinion, and might have uncritically accepted that Soliz was responsible for the shootings and that the shootings were a premeditated retaliation rather than a heat of passion response. While it is true that Lusk testified as an expert witness, his testimony was not the type of expert testimony — scientific evidence, for example — in which the basis for the expert's conclusions would have been unfamiliar to the jury. Lusk clearly presented the basis for his opinions, namely, that he was a sheriff's deputy who had been part of a gang task force and had personally investigated Puente gang crimes. Lusk's opinion that the killing of Skyles and Price could have been gang-motivated was based on the undisputed fact that Puente gang member Billy Gallegos had been killed by Crips gang members two weeks before the Skyles and Price shooting. Gonzales's own testimony was consistent with Lusk's opinion: Gonzales testified he thought Skyles and Price were gang members and initially approached them to ask whether they knew anything about the Gallegos murder. Lusk's opinion that gang members sometimes exaggerate their roles in crimes was similarly based on his experiences with gang members, and he was cross-examined by defense counsel on that point. In summary, the basis for all of Lusk's opinions fell within the jury's understanding and ability to evaluate. Even without being instructed with CALJIC No. 2.80, therefore, the jury could adequately assess his testimony.

Finally, Soliz asserts prejudice from the omission of CALJIC No. 2.20, which instructs on the believability of witnesses, stating in relevant part that "[e]very person who testifies under oath [or affirmation] is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness." As previously discussed, the trial court took judicial notice of the physical impossibility of Gonzales's claim that he had converted a semiautomatic gun into a fully automatic one by altering the trigger spring. Soliz

97

contends that because CALJIC No. 2.20 was not given, the jury did not appreciate that it was the exclusive judge of the credibility of witnesses, and therefore was more likely to accept the trial court's comment, or even to believe that the judge was the sole arbiter of Gonzales's credibility. The judge's comment, however, was an isolated one and its effect therefore did not extend beyond the subject of Gonzales's credibility on the occasion in question. While the judge's comment was erroneous, the error was not prejudicial because Gonzales's credibility had already been severely damaged by the time of the comment. Therefore, instruction with CALJIC No. 2.20 would not have made any difference in the jury's evaluation of Gonzales's credibility.

In conclusion, the trial court's failure to instruct the penalty retrial jury with the evidentiary instructions was error, but was harmless under either state or federal standards of review. (*People v. Carter*, *supra*, 30 Cal.4th at pp. 1221-1222.) Even though we find no prejudice in this case, we once again "strongly caution trial courts not to dispense with penalty phase evidentiary instructions in the future." (*Id*. at p. 1222.) "The cost in time of providing such instructions is minimal, and the potential for prejudice in their absence surely justifies doing so." (*Ibid*.)

14. *New Trial Motion Based on Gonzales's Testimony at the Penalty Retrial*

Although Gonzales did not testify at the guilt or penalty phase of the first trial, he did testify at the penalty retrial. After the jury returned its verdicts at the penalty retrial, Soliz unsuccessfully moved for a new guilt phase trial under section 1181, section (8), arguing that Gonzales's testimony at the penalty retrial was newly discovered evidence. Soliz, joined by Gonzales, now contends the trial court erred in denying this motion. We conclude the contention lacks merit.

98

In his taped conversation with Salvador Berber played for the jury at the guilt trial, Gonzales stated he shot Skyles and Price and that Soliz never got out of the car during the shooting. In the tape, Gonzales briefly described how he ran up to Skyles and Price and shot them: "They were like, 'No, no, no.' I let them motherfuckers have it." When he testified at the penalty retrial, Gonzales gave a more detailed account of the events: He testified he had not intended to kill Skyles and Price and had armed himself only for protection. The conversation with them turned heated when Gonzales responded to their question about where he was from and they replied, "Fuck Puente." When Gonzales saw one of them make a move he interpreted as reaching for a gun, he shot them in reaction.

In his motion for a new trial, Soliz argued that Gonzales's testimony at the penalty retrial was newly discovered evidence that would have rendered a different result probable on retrial because it corroborated Gonzales's taped conversation with Berber in which Gonzales stated he acted alone in shooting Skyles and Price. Soliz argued that the guilt phase jury never had a chance to hear Gonzales testify from the stand and corroborate his taped conversation and that, in a new trial, his live testimony could very well result in a different verdict for Soliz.

On appeal, however, Soliz contends the trial court erred in denying the new trial motion because, as he characterizes it, Gonzales's testimony at the penalty retrial about the Skyles and Price shooting differed "fundamentally" from his statements about it in his taped conversation with Berber heard by the jury at the guilt phase. Whereas the taped conversation tended to support the prosecutor's theory that the shootings of Skyles and Price were unprovoked, Gonzales's penalty retrial testimony indicated that the shootings were provoked by an argument and by Gonzales's belief that Skyles and Price were reaching for weapons. This testimony, Soliz concludes, would have supported guilt phase instructions on voluntary manslaughter based on heat of passion, sudden quarrel, or imperfect

99

self-defense. Because Soliz did not make this argument below, he has forfeited it on appeal.

Even were we to consider this argument on the merits, we would reject it. Soliz's arguments about the differences between the two accounts of the Skyles and Price shootings go to the possibility that *Gonzales* might have obtained a different verdict at the guilt phase, specifically, that he might have received a verdict of involuntary manslaughter based on the account he gave in his testimony at the penalty retrial.[24] Soliz fails to show how the asserted differences between the two accounts would have made a different result probable for *Soliz* at the guilt phase. What mattered for Soliz's guilt phase defense was the evidence that he was not the shooter and did not even exit the car; Gonzales made both of these assertions on the tape. So far as Soliz's guilt phase defense went, therefore, the trial court was correct in observing that Gonzales's live testimony contained nothing new. Because the assertedly newly discovered evidence was cumulative and would not have rendered a different result on retrial probable for Soliz, the trial court did not abuse its discretion in denying his new trial motion. (*People v. Delgado* (1993) 5 Cal.4th 312, 328-329.)

### 15. *Miscellaneous Challenges to the Death Penalty*

Defendants raise various challenges to California's death penalty law. We affirm the decisions that have rejected similar claims and decline to reconsider them, as follows:

California law adequately narrows the class of persons eligible for the death penalty. (*People v. Morrison*, *supra*, 34 Cal.4th at p. 730.)

---

[24] Gonzales, of course, never moved for a new trial based on his testimony at the penalty retrial.

100

"Section 190.3, factor (a), is neither vague nor overbroad, and does not impermissibly permit arbitrary and capricious imposition of the death penalty." (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1165.)

The jury need not make written findings, achieve unanimity as to specific aggravating circumstances, find beyond a reasonable doubt that an aggravating circumstance is proved (except for section 190, factors (b) and (c)), find beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, or find beyond a reasonable doubt that death is the appropriate penalty. (*People v. Morrison*, *supra*, 34 Cal.4th at pp. 730-731; *People v. Williams*, *supra*, 49 Cal.4th at p. 459.) Moreover, the jury need not be instructed as to any burden of proof in selecting the penalty to be imposed. (*People v. Burgener*, *supra*, 29 Cal.4th at p. 885.) The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 961; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) have not altered our conclusions in this regard. (*People v. Salcido* (2008) 44 Cal.4th 93, 167; *People v. Hoyos*, *supra*, 41 Cal.4th at p. 926.)

The absence of intercase proportionality review does not violate the Eight and Fourteenth Amendments to the United States Constitution. (*People v. Thompson* (2010) 49 Cal.4th 79, 143.)

The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b). (*People v. Friend* (2009) 47 Cal.4th 1, 90.)

"The use of certain adjectives such as 'extreme' and 'substantial' in the list of mitigating factors in section 190.3 does not render the statute unconstitutional." (*People v. Thompson*, *supra*, 49 Cal.4th at p. 144, citing *People v. Prieto* (2003) 30 Cal.4th 226, 276.)

"[T]he jury need not be instructed as to which sentencing factors are aggravating and which are mitigating." (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 862.)

The phrases "so substantial" and "warrants" in CALJIC No. 8.88 are not unconstitutionally vague. (*People v. Salcido*, *supra*, 44 Cal.4th at p. 162; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 123-124; *People v. Arias*, *supra*, 13 Cal.4th at pp. 170-171.) CALJIC No. 8.88 is not defective for failing to inform the jury as to which side bore the burden of persuading it of the appropriateness or inappropriateness of a penalty of death in the case. (*Coffman and Marlow*, at p. 124.) Nor is a court required to instruct the jury that if the aggravating circumstances do not outweigh those in mitigation, a sentence of life without the possibility of parole is mandatory. (*Ibid*.)

CALJIC No. 8.85 is not unconstitutionally vague. (*People v. Perry* (2006) 38 Cal.4th 302, 319.) The trial court has no obligation to modify the instruction to delete inapplicable aggravating and mitigating factors. (*Ibid*.)

The trial court is not constitutionally required to instruct that there is a presumption that life without the possibility of parole is the appropriate sentence. (*People v. Arias*, *supra*, 13 Cal.4th at p. 190.)

"International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Friend*, *supra*, 47 Cal.4th at p. 90.)

### 16. Cumulative Errors

Defendants contend the cumulative effect of the asserted guilt and penalty phase errors requires reversal of their conviction and death sentence even if none of the errors is prejudicial individually. We conclude that any errors or assumed errors were nonprejudicial, whether reviewed separately or cumulatively.

### III. DISPOSITION

The judgments are affirmed.

WERDEGAR, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
BAXTER, J.
CHIN, J.
CORRIGAN, J.
HOLLENHORST, J.*

---

*     Associate Justice, Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Gonzales & Soliz
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S075616
**Date Filed:** July 28, 2011
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert W. Armstrong

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Jay Colangelo and Jessica K. McGuire, Assistant State Public Defenders, for Defendant and Appellant Michael Soliz.

Joseph F. Walsh, under appointment by the Supreme Court, for Defendant and Appellant John Anthony Gonzales.

Bill Lockyer, Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorney General, Pamela D. Hamanaka, Assistant Attorney General, John R. Gorey, Sharlene A. Honnaka and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jessica K. McGuire
Assistant State Public Defender
801 K Street, Suite 1100
Sacramento, CA  95814
(916) 322-2676

Joseph F. Walsh
316 W. Second Street, Suite 1200
Los Angeles, CA  90012
(213) 627-1793

Steven D. Matthews
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2367